Mitchell Langberg (CA Bar No. 171912)
Thomas A. Clare (*pro hac vice forthcoming*)
Megan McGuiggan (*pro hac vice forthcoming*)
Carolyn M. Wesnousky (*pro hac vice forthcoming*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
mitch@clarelocke.com
tom@clarelocke.com
megan.mcguiggan@clarelocke.com
carrie@clarelocke.com
*Attorneys for Plaintiff, Tyra Banks*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

TYRA BANKS, an individual,

    Plaintiff,

    v.

NETFLIX WORLDWIDE
ENTERTAINMENT, LLC,
89 BLOCKS HOLDINGS, LLC d/b/a
EVERWONDER STUDIO, NETFLIX
MUSIC, LLC, MOR LOUSHY, an
individual, and
DANIEL SIVAN, an individual.

    Defendants.

Case No. 2:26-CV-06467

**COMPLAINT FOR:**

**1) FALSE LIGHT**
**2) DEFAMATION BY
IMPLICATION**
**3) DEFAMATION BY
IMPLICATION**
**4) BREACH OF CONTRACT**
**5) LANHAM ACTION § 43(A)—
FALSE ENDORSEMENT**

**JURY TRIAL DEMANDED**

Plaintiff Tyra Banks hereby alleges against Netflix Worldwide Entertainment, LLC ("Netflix"), 89 Blocks Holdings, LLC d/b/a EverWonder Studio, Netflix Music, LLC, Mor Loushy, and Daniel Sivan as follows:

## JURISDICTION AND VENUE

1.      This Court has original jurisdiction under 28 U.S.C. § 1331 because this action arises in part under the laws of the United States, specifically the Lanham Act, 15 U.S.C. § 1125(a).  This Court also has original jurisdiction under 28 U.S.C. § 1332 over the state law claims because those claims are between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.  In the alternative, this Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over all state law claims because they form part of the same case or controversy as the federal claims asserted herein.

2.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, Plaintiff resides in this district, and one or more Defendants maintain their principal place of business in this district.

## INTRODUCTION

3.      Tyra Banks participated in the Netflix documentary series about *America's Next Top Model* ("ANTM") because she believed viewers deserved a candid conversation about the show's legacy—its successes and its shortcomings. There are aspects of the show for which Ms. Banks takes accountability and she wanted ANTM viewers to hear that from her directly.

4.      Going into her interview, Ms. Banks did not limit the ANTM topics the interviewer could ask.  During a three-and-a-half-hour interview, Ms. Banks answered questions about the show's groundbreaking history, including criticism of decisions she would approach differently today.  The Netflix series *Reality Check: Inside America's Next Top Model* (the "Netflix Series") was sold to viewers

as a "***documentary*** series."  Netflix called it "the definitive, must-watch chronicle of America's Next Top Model."  The genre matters.  Viewers of a documentary do not expect manufactured drama or constructed narratives.  They expect facts.  Because they were promised a documentary, that is exactly how viewers interacted with the Netflix Series.

5.     Of the hours of answers Ms. Banks provided, the producers used only about sixteen minutes.  The producers used what could be stripped of context and reassembled to support a false and defamatory narrative unrelated to what she actually expressed.  The accountability Ms. Banks took ended up on the cutting room floor.  It was there, but viewers were never given the opportunity to see it.

6.     Worse, the false narrative the producers constructed—through selective editing, deliberate omission, and surgical manipulation of continuous footage—included that Ms. Banks knowingly allowed a contestant to be sexually assaulted on her show, exploited that contestant's trauma for ratings, and then could not even remember it when asked.  That narrative about Ms. Banks is a complete fabrication—one that Netflix streamed to a global audience of millions.

7.     Mor Loushy, one of the directors and executive producers of the Netflix Series, has since told the world that Ms. Banks was provided the "opportunity to really go deep into the debates" about ANTM and to "share her side of the story."[1]  In another interview, Ms. Loushy said Ms. Banks "was ready to speak, and I think that a lot of her answers were very honest. ***And it's all in the show, really***."[2]  Both statements were partially true.  Ms. Banks did go deep.  She

---

[1]     Kay Wicker, *"Reality Check" director says documentary would have happened with or without Tyra Banks*, The Grio (Feb. 19, 2026), https://www.aol.com/articles/reality-check-director-says-documentary-154133293.html?.

[2]     Savannah Walsh, *The One Question Tyra Banks Refused to Answer in the America's Next Top Model Documentary*, Vanity Fair (Feb. 17, 2026),

2

did share her side. Her answers were very honest. But the story that viewers heard was the deceptive story producers chose to tell.

8. A particularly egregious example of the producers' manipulation to create a false narrative occurred at the close of Episode 1 of the Netflix Series. Shandi Sullivan was a contestant on Cycle 2. One of the areas of interest about ANTM over the last twenty years has been about an evening during which Ms. Sullivan was intoxicated, had intercourse with a man in Milan, and quickly confessed her infidelity to her longtime boyfriend. On the Netflix Series, Ms. Sullivan is shown describing the event as an assault—something Ms. Banks had never heard before and *was not told during her interview*. Having withheld that information, Ms. Loushy asks Ms. Banks: "You remember the story with Shandi?" The episode shows Ms. Banks glance upward, say "um," and then the screen cuts to black. The implication is devastating and deliberate: that Tyra Banks cannot even remember the story of the woman who was assaulted on her show.

9. But that was false. The full footage of Ms. Banks' interview reveals two things that the producers cut out and did not show viewers in Episode 1: before the upward glance, Ms. Banks nods—affirmatively, unmistakably—*and* immediately says, "I do remember her story." By carving the nod out of the middle of the sequence and cutting off Ms. Banks' comment at the end, the producers ensured that viewers would see only the lie and not the truth.

10. Defendants didn't stop there. In the second episode of the Netflix Series, they also rearranged footage from the original ANTM broadcast to make it appear that Ms. Banks initiated a discussion about cheating to manipulate Ms.

https://www.vanityfair.com/hollywood/story/tyra-banks-americas-next-top-model-documentary-director-interview?srsltid=AfmBOoqsgMRqLG7_qN7XtN5l05citHro75UjSDjpc4LKxKuiNyX5IS97 (emphasis added).

Sullivan into making an on-air confession. The truth is that Ms. Sullivan—not Ms. Banks—brought up the subject of infidelity and Ms. Banks responded. The producers had the original footage. They knew the truth.

11. This manipulation was part of a scheme that the producers concocted before they conducted Ms. Banks' interview. Ms. Sullivan had already made the difficult decision to tell the producers she had come to view the events in Milan as a sexual assault. But they purposefully withheld that information from Ms. Banks.

12. Ms. Banks wishes that it was not necessary to recount those facts here. She respects Ms. Sullivan's right to speak up, in her own words. The issue is not Ms. Sullivan sharing her views and speaking up. The issue is that Ms. Loushy never asked a single question of Ms. Banks that framed the encounter as nonconsensual. Ms. Banks' answers were given as part of a discussion that she was misled to believe was about regret and infidelity, which was the only framing Ms. Banks had ever encountered.

13. Defendants edited the Netflix Series to make it appear that Ms. Banks knew she was being asked about a sexual assault and was intentionally trying to evade the topic. Ms. Banks respects Ms. Sullivan's perspective and the courage it takes for Ms. Sullivan and others to speak up. Ms. Banks wishes somebody involved with the Netflix Series would have told her what Ms. Sullivan shared with them. But they deliberately chose not to.

14. Ms. Banks does not file this lawsuit to escape scrutiny. She came to the interview prepared to engage with ANTM's legacy, including its shortcomings—and she did, for three and a half hours. Viewers who came away from the Netflix Series believing Ms. Banks had not taken accountability would have known that accountability was, in fact, a major part of her interview—if only Netflix and the producers had included it in the Netflix Series. Little of it was. The producers erased much of that record and replaced it with a fabricated one.

15.     The Netflix Series contains other misrepresentations about Ms. Banks and ANTM—some petty, some more serious—that she could have addressed, chosen to live with, or let pass as the unavoidable cost of three decades in public life.   She is not addressing all of them here.   But what she cannot leave unchallenged is the manufactured and false accusation in the Netflix Series suggesting that a young woman on ANTM was sexually assaulted and Ms. Banks did nothing—worse, that she exploited that woman's trauma.   That is not a lie she can correct in an interview or that will disappear with the passage of time.

16.     It is a fabrication so grave, constructed so deliberately, that it overwhelms everything else.   Every other conversation about ANTM's legacy—including the candid reflection Ms. Banks came prepared to have—is now drowned out by an accusation she was never given the chance to answer.   This lawsuit is that answer—particularly after her efforts to resolve the matter directly with Netflix and the producers were refused.

17.     To make matters worse, and to add insult to injury, Netflix Music LLC released a separate 26-track music soundtrack entitled "Reality Check Inside America's Next Top Model," using an unauthorized image of Ms. Banks on the album cover (the "Album Cover") to serve as a false message to consumers that

Ms. Banks was the source of or otherwise affiliated with the Album and endorsed it:



18.     Before deciding to take legal action, Ms. Banks asked Netflix and the producers for one thing: access to the unedited footage of her own interview, under whatever conditions they chose, so the parties could work together to correct the record.  Her request was refused.  Had they agreed, Ms. Banks could have made the truth public and this litigation would likely have been unnecessary.

19.     Ms. Banks brings this action to hold Defendants accountable for the harm they deliberately engineered.  She wants the public to have the opportunity to view the complete unedited footage and form their own opinions based on the truth.  As of now, Ms. Banks does not have that footage or the ability to make it public.  Only Netflix and the producers do.

## PARTIES AND RELEVANT NON-PARTIES

20.    Plaintiff Tyra Banks is an American supermodel, entrepreneur, and the creator and host of ANTM.  She is a California citizen.

21.    Defendant Netflix Worldwide Entertainment, LLC ("Netflix") is an entity headquartered in Los Angeles County, California.  It is the copyright holder on the Netflix Series.  On information and belief, it is a licensee and/or assignee of certain contractual rights and obligations as alleged hereinbelow.

22.    Defendant Netflix Music, LLC ("Netflix Music") is an entity headquartered in Los Angeles, California.

23.    Defendant 89 BLOCKS HOLDINGS, LLC d/b/a EverWonder Studio ("EverWonder") is a limited liability company based in New York, New York.  On information and belief, no member of the LLC is a California citizen.  EverWonder co-produced the Netflix Series.

24.    Defendants Mor Loushy and Daniel Sivan are husband and wife.  On information and belief, they are domiciled in the State of New York.  Ms. Loushy and Mr. Sivan met in 2004 when they were both working on what they call "the trashiest" version of *The Swan*."[3]  They were the directors of the Netflix Series and were co-Executive Producers.  Ms. Loushy interviewed Ms. Banks for the Netflix Series and they both substantially participated in the editing of the Netflix Series.

25.    Wise Child Studios LLC ("Wise Child") is a non-party co-producer of the Netflix Series.

---

[3]    Savannah Walsh, *The One Question Tyra Banks Refused to Answer in the America's Next Top Model Documentary*, Vanity Fair (Feb. 17, 2026), https://www.vanityfair.com/hollywood/story/tyra-banks-americas-next-top-model-documentary-director-interview.

# FACTS

## *Tyra Banks Enters the Modeling World and Fights for a More Inclusive Industry*

26.     Before she became a household name, Tyra Banks struggled to make headway in an industry not built for her.  When Ms. Banks started modeling in the late 1980s, the fashion industry's standards of beauty were narrow and not diverse. Ms. Banks challenged the status quo.

27.     Undeterred by antiquated industry standards, a teenaged Ms. Banks set out in search of her big break.  She worked tirelessly to be signed by an agent, but faced repeated rejection in an industry where opportunities for Black models were narrowly limited.  Ms. Banks was denied by six agencies before finally being signed by L.A. Models in 1989.

28.     Despite countless challenges, Ms. Banks persisted to become one of the most widely recognized figures in her industry.  In the late 1990s, she became the first Black model to be featured on the cover of *Sports Illustrated*, the first female model to appear on the cover of GQ, and the first ever Black model to contract with Victoria's Secret.  She has been widely credited as helping transform the industry at large, paving the way for a more diverse industry and opening the doors for women and girls who did not fit the traditional mold.

## *ANTM Premiers and Becomes a Global Cultural Phenomenon That Persists for 24 Cycles*

29.     Against this backdrop, Ms. Banks had the idea to launch the television series that would become ANTM.  As Ms. Banks has described, she created ANTM to challenge the industry that had tried to exclude her: "What if I created a show where you saw what it took to become a model?  And for this show to represent not all white, not all skinny, but just showing all the differences and all the different types of beauties."

30. Ms. Banks' more inclusive project received rave reviews. The first Cycle of ANTM premiered in 2003 on UPN network, garnering millions of viewers per episode. It featured a cast of 10 aspiring models. Ms. Banks' mission was to challenge who the modeling industry was willing to recognize as a model. The industry's definition of beauty was narrow; her goal was to expand that definition from within. Within an industry that, for generations, favored a limited standard, she fought to ensure the show represented a broader range of aspiring models than the industry had historically made room for. That broader representation became part of what made the show resonate with millions of viewers.

31. The show grew both in popularity and global impact. The U.S. version of ANTM has aired in approximately 180 countries, and international versions of ANTM were licensed and launched in approximately 50 different countries. The original show's global popularity was enhanced by the structure of ANTM, which, across its cycles, sent aspiring models to countries on every continent other than Antarctica to participate in modeling challenges and film full episodes. The U.S. version alone aired 24 cycles between 2003 and 2018.

### Tyra Banks As Creator, Judge, and Executive Producer

32. Ms. Banks created ANTM and served as an Executive Producer. Her primary focus was the show's creative vision, including helping shape the cast, photo shoots, fashion shows, and modeling challenges that became central to the episodes. Like any major television production, the show involved many voices and layers of executive approval, but Ms. Banks takes accountability for her own creative choices—the groundbreaking ones and the ones she would approach differently today.

33. Each episode was built around approximately four days of production, including a judging day.

34. Ms. Banks was present for the entirety of each judging day—the days on which the panel convened to evaluate contestants and deliver results. Her presence on other filming days varied based on the nature and requirements of the day's activities. On some days, she was not on set at all. On others, she was present for a limited time—for instance, to welcome contestants at the start of a new cycle, to introduce a challenge, or to make a surprise appearance. On still others, she was on set for several hours, including mentoring contestants one-on-one or in a group setting, serving as a photographer, conducting training sessions, attending contestant fashion shows, or coaching them during photo shoots.

35. Cameras ran continuously across all filming locations, capturing contestant interactions, challenge preparation, training sessions, and off-hours activity. The volume of raw footage generated in the course of a single episode was enormous. Ms. Banks was not present for most of what those cameras captured.

36. Nor did Ms. Banks review that raw footage. The day-to-day production team reviewed the footage, developed the episode narratives, and assembled the initial cuts. Ms. Banks reviewed episodes once they were initially shaped, sequenced, and given a narrative direction and then participated in additional editing until the episodes were "locked." Her role of Executive Producer was focused on the creative aspects of the show, including helping shape casting, coaching themes, conceiving challenges, designing photoshoots, and performance evaluation. Certainly, it was not Ms. Banks' role to supervise every video camera or to personally review everything those cameras recorded.

37. In the early cycles of ANTM, including Cycle 2, Ms. Banks typically first encountered edited material for notes and review only after filming for the full cycle had concluded, often months after production took place.

***Ms. Banks Has Engaged With Legitimate Criticisms of ANTM***

38.   Ms. Banks is proud of ANTM's accomplishments—opening doors the industry had long kept shut, decades before inclusivity became part of the modeling and beauty industries' narrative.  The list is long, but by way of example:

- ANTM provided a worldwide television platform to a transgender model at a time when the industry offered none;
- It proved that a model outside of the industry's sample-size standard could win an internationally televised modeling competition;
- It showed the world that a contestant who is deaf could not only compete at an exceptional level, but win; and
- It crowned a winner who defied the industry's traditional height expectations in Cycle 3, and later dedicated an entire cycle to petite models, challenging the industry's long-standing height barriers.

39.   But Ms. Banks and ANTM did not always get it right.  Ms. Banks knows this and has been receptive to constructive feedback about the show.

40.   There was renewed interest in ANTM during the COVID-19 pandemic.  At the time, all cycles of the show were available for streaming.  Confined to their homes during lockdown, the public began binge watching the show, offering commentary on those prior cycles, and critiquing ANTM through a modern-day lens.

41.   Ms. Banks took ownership of the show's creative choices.  With the benefit of time, reflection, and evolving social norms, Ms. Banks many times directly responded to that criticism.  For example, millions of her followers saw her acknowledge "the insensitivity" of some past ANTM moments, owning that she made "some really off choices":

11

**Tyra Banks** ✔
@tyrabanks

Been seeing the posts about the insensitivity of some past ANTM moments and I agree with you. Looking back, those were some really off choices. Appreciate you honest feedback and am sending so much love and virtual hugs. ❤️

12:16 AM · May 9, 2020 · Twitter for iPhone

42.    This post—amplified by others who shared and quoted it—was not the only time Ms. Banks acknowledged things she considered to be mistakes.

43.    Ms. Banks has taken the opportunity to address some of the critiques of ANTM—and has done so publicly—including on her talk show, in the book she wrote with her mother, in interviews, and during public appearances. She acknowledged where the show fell short and offered context where the criticism might have missed the full picture. However, after 24 cycles and hundreds of participants, no one could reasonably be expected to respond to every criticism.

44.    Ms. Banks realized that her prior responses were spread across time and forums and many ANTM viewers never had the opportunity to hear those responses. So, when the producers approached Ms. Banks about participating in the "definitive docuseries on America's Next Top Model," she took time to understand the scope and purpose of the project.

45.    Over the course of several discussions, the producers made a series of representations that convinced Ms. Banks that they intended to create a fair and truthful documentary of ANTM. Relying on them, Ms. Banks agreed to participate, ready to engage with ANTM's legacy and share her perspective on it, flaws and all.

### Defendants Pitch the Netflix Project as a Balanced Definitive Account of ANTM's Legacy

46.    In February 2025, Jon Adler, an Executive Producer at EverWonder, reached out to Ms. Banks' publicist with a written summary (the "Pitch Materials")

12

of a proposed project then titled "On Top" (Exhibit 1).  The Pitch Materials bore Netflix's logo on its cover and described the project as "[a] definitive three-hour Netflix docuseries exploring *America's Next Top Model* as a groundbreaking pop-culture phenomenon."

47.    Ms. Banks had long trusted and admired Netflix.  That Netflix featured prominently in the Pitch Materials and was putting its own brand behind the producers was of deep personal significance to both Ms. Banks and the other members of her household.  Netflix's involvement is the reason Ms. Banks even considered the project—she had no prior knowledge about the other entities and people involved.

48.    The Pitch Materials made a series of specific written representations about the nature and tone of the project:

- The documentary would unpack the show's legacy "not as a takedown, but as a thoughtful, in-depth reflection on its influence, evolution, and impact on fashion, television, and culture."
- It would be "equal parts authoritative and celebratory."
- The producers wrote that "[u]nlike other productions, we take that responsibility seriously and will treat the subject matter and all participants with respect."
- And the project's stated purpose was "to look back and celebrate what ANTM achieved and appreciate the outsized impact it still has on pop culture, even to this day."

49.    For years, Ms. Banks publicly discussed how the show was groundbreaking ***and*** where they made mistakes.

50.    The Netflix Series was presented to her as an opportunity to address all aspects of ANTM.  The way the producers described her role in the project convinced Ms. Banks that it was a perfect forum to share all of that.  As they put it

13

in the Pitch Materials, the documentary would provide "the space to reflect on *America's Next Top Model* in a way that hasn't been done before" and to explore "how the show broke barriers, where it sparked critical conversations, and how its impact is still felt today."

51.     The producers told Ms. Banks this was her "opportunity to share her personal journey… addressing the challenges, successes, and complexities of shaping a show that changed the landscape of reality television and modeling."

52.     While that framing held out the prospect of candid discussion—including the difficult parts—nothing suggested that the project would falsely accuse Ms. Banks of covering up a sexual assault, or being indifferent to what a contestant characterizes as a traumatic experience.

53.     The producers' representations about the project's tone were not limited to the Pitch Materials.  In a subsequent conversation with Ms. Banks' public relations and talent teams, Mr. Adler reiterated that the goal was to explore "the cultural and television impact of *America's Next Top Model*."

54.     Netflix was aware of all of this.  Mr. Adler informed Ms. Banks' team that Netflix was aligned with the approach.

55.     The project that was pitched to Ms. Banks bears no resemblance to the one Defendants produced.

### *Defendants Conceal That Other ANTM Personalities Were Serving as Consultants*

56.     The Pitch Materials identified "ANTM mainstays Miss J, Nigel Barker, and Jay Manuel" as confirmed participants in the project, alongside "a diverse lineup of models."  When the producers were communicating with Ms. Banks, the former judges were presented as interview subjects, just as Ms. Banks would be.

57. What Ms. Banks did not know—and what the producers did not disclose—was that Jay Manuel, Miss J Alexander, and Nigel Barker were not mere interview subjects like she was. As Nigel Barker has publicly revealed, the three former judges were the people who first conceived of the idea for a documentary. They were ultimately credited as "Consultants" on the Netflix Series, a designation confirming they had editorial influence and, possibly, were being paid or otherwise compensated in connection with their involvement with or contribution to the Netflix Series.

58. This intentional omission by the producers was material—and they knew it. In particular, Jay Manuel had made no secret of his grudge against Ms. Banks and the show following the non-renewal of his ANTM contract.

59. Had Ms. Banks known these individuals were so deeply involved in the formulation of the Netflix Series, also serving as consultants shaping the editorial direction, and that she had been excluded from such a role, it would have raised a red flag. She would have known she was being set up. She would not have participated.

60. She also did not know—and was never told—that Netflix planned for these former judges to go on a press tour, amplifying the false attacks laid out in the Netflix Series. The producers' deception could only have been for the purpose of depriving Ms. Banks of the ability to make an informed decision about whether to sit for the interview that they would later use against her.

### Defendants Disclose Interview Topics in Apparent Good Faith—While Concealing Their Preconceived Narrative

61. In the weeks before the interview, Ms. Banks' team worked with Defendants to establish the length and scope of the interview.

62. On April 10, 2025, Vanessa Golembewski of EverWonder provided the finalized list of topics they would discuss. They included:

- Ms. Banks' early modeling years;

- The making of ANTM;

- Changes in the fashion and beauty industry; and

- "[W]hat's been misunderstood or untold about the show."

63. Again, Ms. Banks was encouraged that the interview would not be a mere puff piece and would cover some of the events that were misunderstood and untold. But the list contained no reference to sexual assault. No reference to Ms. Sullivan or the events in Milan. No reference to any allegation that Ms. Banks had knowledge of, or involvement in, allowing an assault to take place and then covering it up. No reference to the false central thesis of the documentary the producers were already manufacturing.

64. The absence of these subjects from the topic list was not an oversight. It was a tool of concealment.

### Ms. Banks Sits for a Three-and-a-Half-Hour Interview in Reliance on Defendants' Representation

65. Based on the written representations in the Pitch Materials, the oral commitments of Mr. Adler and his team, and the list of discussion topics, Ms. Banks sat for an interview in New York on April 18, 2025. A member of Ms. Banks' public relations team attended the shoot. Mr. Adler was present on set throughout.

66. The interview was originally scheduled to last only thirty minutes.

67. During the interview and comforted by everything she had been told about the project's purpose and the producers' intent, Ms. Banks did not end the interview after thirty minutes. Instead, she spoke openly for more than three and a half hours.

68. Ms. Banks used the time as an opportunity to candidly reflect on ANTM's history. Responding to questions posed, she took accountability for

16

aspects of the show she wished she had handled differently and engaged with the kinds of legitimate criticisms she had heard before. She gave the producers exactly what they needed—not because she was naïve, but because she had been deliberately and systematically misled about how it would be used.

69. Once Ms. Banks left the interview, neither the producers nor anybody from Netflix contacted her again for fact checking. Nor did they give her an opportunity to respond to the accusations they were building into the Netflix Series—accusations they had gathered from other participants before Ms. Banks ever sat down, and which they deliberately withheld from her during the interview. They did not seek her input in any way before the Netflix Series was finalized.

### *Defendants Deceptively Reassure Ms. Banks*

70. Having secured the interview footage they needed, the producers did not stop cultivating Ms. Banks' trust. Instead, they escalated.

71. Though Ms. Banks now sees it all as a disingenuous ploy, both Netflix and the producers' conduct following the interview was a clear effort to persuade Ms. Banks about how important her participation was to the success of the Netflix Series and how badly they wanted her to continue participating. To accomplish this, they continued their efforts to ingratiate themselves with Ms. Banks. This was particularly true of Mr. Adler. During her interview, Ms. Banks expressed to the interviewer, "You have no idea what we have planned for Cycle 25." Since the final episode of Cycle 24 aired in 2018, ANTM fans have consistently and publicly called on Ms. Banks to bring back the series for Cycle 25, underscoring the sustained demand and audience interest and a meaningful opportunity to reignite the franchise.

72. Before Ms. Banks left the interview location, Mr. Adler discussed his interest in working on Cycle 25 with her.

73. Then, shortly after the interview, Mr. Adler emailed Ms. Banks to thank her. He told her how happy he was that he had a chance to meet Ms. Banks on the interview set. As he explained: "To say that you strengthened the series would be the greatest understatement of all time . . . I know it will do the story justice in a way no one else could." (Exhibit 2).

74. Ms. Banks had no idea of Defendants' plan, as reflected in her response to Mr. Adler: "I care deeply about the legacy of ANTM, and I want the story to be told with heart and I am happy my voice will be integral." She continued, "It was great to meet you too. I can tell the project is in thoughtful hands, and that gives me peace. I'm excited to see how it all comes together."

75. Ms. Banks' trust was violated. The false story Netflix would stream to the world and the true facts the producers withheld from viewers did not do Ms. Banks or the true story any justice at all. But Mr. Adler, Netflix, and the producers did not care. Their goal was clear. And it had little to do with telling the truth.

76. Knowing the truth now, Ms. Banks finds it particularly odd and offensive that Mr. Adler also used his post-interview emails to continue to press for his involvement in Cycle 25 of ANTM. He wrote, "talking to your agents about development for cycle 25 :)."

77. The flattery continued. The following month, Mr. Adler reached out again to request that Ms. Banks participate in a "reunion" bonus episode of the Netflix Series. He asked: "[A]re you open to a reunion moment as part of a larger creative that would bring together you, Miss J, Jay Manuel, and Nigel?" (Exhibit 3).

78. In hindsight, it is very fortunate that Ms. Banks declined through her agent, explaining that she had not seen the documentary and was not comfortable participating in additional content without having viewed the finished product. It appears that Netflix and the producers were already planning to have those three

former judges participate in a national and online PR campaign that would be used to amplify their false and defamatory attack.

79.    Further, neither Netflix nor the producers responded by allowing Ms. Banks to review the Netflix Series.  That was no accident.  They all clearly knew that if Ms. Banks saw the lies the producers had manufactured, Ms. Banks would not participate in any way and might take legal action to prevent them from publishing their false attacks because they had contractually agreed not to defame her.

80.    Undeterred, in November 2025, Mr. Adler reached out again asking Ms. Banks to record a video message for a Netflix senior leadership quarterly meeting (Exhibit 4):

> …Liz Franco at Netflix called me earlier to give me some great news: At the quarterly Netflix senior leadership mtg, they are profiling one documentary series that they are excited about for next quarter--OURS!  And as such, they would love for Tyra to send a video message saying hello and how happy she was to participate in the project.

Mr. Adler said the meeting would include Netflix's Co-CEO Ted Sarandos and Co-Founder Reed Hastings:

> They asked me to let you know that Ted and Reed are present at these mtgs - so it's a very big deal.

81.    Ms. Banks gave serious consideration to the request out of respect for Netflix's senior-most leadership.  The request was not unusual.  Historically Ms. Banks has made similar high-level corporate appearances to support projects about which she was fully informed so that she could speak accurately about them.  But, still, nobody associated with the Netflix Series had provided the final Netflix Series to Ms. Banks.   So, she politely declined, again explaining through her

19

representatives that she could not participate because she had not seen the Netflix series.

82. Even after that, nobody provided Ms. Banks with an opportunity to review the final Netflix Series. Nonetheless, Mr. Adler persisted. As the streaming release date for the Netflix Series approached in early 2026, Mr. Adler introduced Ms. Banks to John Raphael Oliveira from Netflix's public relations team. Oliveira requested permission to use still images of Ms. Banks from her interview in promotional materials, noting that Netflix "anticipate[d] [to] get a lot of incoming requests once we start our promotional campaign for the documentary." (Exhibit 5).

83. Ms. Banks again declined. For the same reason—she could not promote what she had not seen.

84. Each of these requests followed the same pattern: Ms. Banks was asked for more—more content, more promotion, more of her name and likeness—without ever having the opportunity to see what Netflix and the producers wanted her to promote. They kept her in the dark because they did not want her to know.

***Ms. Banks Does Not Get Access to the Netflix Series Until Only One Day Before It Streams to a Global Audience***

85. Netflix and the producers finally gave Ms. Banks access to the documentary on February 15, 2026—one day before it premiered on Netflix.

86. By that point, the promotional campaign was already underway. Netflix had distributed a trailer across social media platforms, shaping public perception of the documentary before Ms. Banks had any opportunity to see it, let alone respond. Netflix sent press kits and screen grabs to journalists. The narrative had been set.

87. Ms. Banks was given less than a day to absorb a three-episode attack on her character before it was streamed to a worldwide audience of millions. She

20

had no opportunity to corrections inaccuracies, request edits to false or misleading statements, or withdraw her participation. That was not an accident. It was by design.

### *The Netflix Series is Released for Streaming*

88. The Netflix Series premiered on Netflix on February 16, 2026. The final product consisted of three episodes—165 minutes in total. The Netflix Series immediately garnered significant attention and millions of views. It occupied Netflix's #1 most-watched spot during the week it premiered and beyond, and on information and belief, multiple subsequent weeks in its top 10. The Netflix Series is still streaming in approximately 130 countries worldwide.

89. Even though she sat for roughly 210 minutes of questioning, Ms. Banks' footage was edited down to sixteen minutes. Obviously, not all of her interview would be used. But by incorporating so little of it and manipulating the parts that remained, the Netflix Series did not include a faithful reflection of what Ms. Banks said. Nor was it a fair and accurate factual account about ANTM as Ms. Banks was promised by the producers in their efforts to persuade her to participate. It was carefully crafted to convey a series of false narratives—including one that intentionally (and falsely) portrayed Ms. Banks as knowledgeable about and indifferent to a contestant's sexual assault.

90. Again, since the resurgence of interest in ANTM, the show was the focus of both renewed appreciation and public criticism, including about some of the show's and Ms. Banks' creative choices. Ms. Banks heard the criticism, reflected on it, and was again prepared to address it directly. The lengthy interview was her opportunity to do just that—now on the worldwide Netflix streaming platform that would ensure that ANTM viewers everywhere would hear her respond to all the questions—including the tough ones.

91.    Over the course of three and a half hours, she engaged candidly with many of those criticisms, acknowledged what she would do differently, and spoke with specificity about decisions she regretted.  Little of that made it into the Netflix Series.  Viewers who had watched ANTM, who had followed the criticism, and who deserved to hear Ms. Banks' genuine response were denied it.

92.    What Netflix and the producers chose to air erased that record and replaced it with the false impression that Ms. Banks refused to take accountability for many of those criticisms.  She had taken accountability.  Defendants made sure no one would hear most of it.

### Shandi Sullivan's Appearance on ANTM Cycle 2

93.    From the very first episode, the Netflix Series prominently features Cycle 2 contestant Shandi Sullivan.  At the time she appeared on Cycle 2 (the same time Netflix Series directors Mor Loushy and Daniel Sivan were editing the Swan), Ms. Sullivan was eighteen years old.  A Missouri native, she was working at Walgreens when her then-boyfriend encouraged her to audition for ANTM.

94.    Ms. Banks was excited about Ms. Sullivan as a contestant given ANTM's mission to showcase people from a variety of different backgrounds and who challenged then-conventional beauty norms.  Ms. Sullivan was a talented and memorable contestant whose story was prominently featured in many episodes of the cycle, including the tenth episode, titled "The Girl Who Cheated."

95.    At the time of Cycle 2 and for years thereafter, viewers publicly discussed Shandi's storyline in the tenth episode as a public airing of the events surround Ms. Sullivan cheating on her boyfriend.  Today, many criticize ANTM's decision to show those events and Ms. Sullivan's emotional struggle in the aftermath.  But, at the time, the broad public discussion did not characterize the events other than as infidelity.  And that was also Ms. Banks' understanding.

22

96.    In the ninth episode of Cycle 2, Ms. Sullivan spoke to her boyfriend by phone, and they had an intense argument about one of his female friends.  In that same episode, Ms. Sullivan commented on camera: "I miss my boyfriend… but then I thought I'm here, I'm going to have a good time.  I don't care."  This was the only framing that viewers—including Ms. Banks—understood at the time: Ms. Sullivan was a young woman making a conscious choice to "have a good time" while away from her boyfriend.

97.    In the tenth episode, the remaining contestants, including Ms. Sullivan, were in Milan attending appointments around the city.  The men who operated their transportation—providing rides on mopeds—were later invited to the contestants' apartment for dinner.

98.    The footage from that evening depicts Ms. Sullivan and the others socializing and drinking wine.  Ms. Sullivan is shown kissing one of the men and later discloses on camera that the two had intercourse.

99.    The ANTM episode shows Ms. Sullivan afterward as extremely upset and crying.  Later, she called her boyfriend to confess in an emotional conversation.

100.    As the ANTM episode shows, the contestants later met with Ms. Banks for coffee.  But the producers of the Netflix Series changed the sequencing.  As they depict it, Ms. Banks started a discussion about infidelity and asked Ms. Sullivan if she had cheated on her boyfriend.

101.    In truth, Ms. Sullivan—not Ms. Banks—introduced the subject of infidelity.  Ms. Sullivan turned to Ms. Banks and asked: "I have a personal question . . . have you ever cheated on anyone?  Or had anyone cheat on you?"

102.    Ms. Banks honestly replied that, years prior, a model she was dating cheated on her and that it hurt her deeply.  Only after that did the discussion about Ms. Sullivan "cheating" on her boyfriend unfold.

103. Ms. Banks responded with compassion: "Everybody's messed up, Shandi. I'm not judging you." At the time of the original broadcast, and for nearly two decades afterward, the publicly available understanding of Ms. Sullivan's experience in Milan was that the strong feelings Ms. Sullivan expressed in that episode and those that followed stemmed from regret over infidelity. Before the Netflix Series was released, that was the only framing Ms. Banks had ever encountered.

104. Ms. Sullivan has since spoken publicly about coming to understand those events differently over time. Ms. Banks respects that process entirely. Had the producers informed Ms. Banks about what Ms. Sullivan said during her interviews with them, Ms. Banks would have addressed the situation in a vastly different way.

105. But the producers deprived Ms. Banks of that opportunity. Instead, they withheld that information from Ms. Banks and made the intentional decision to have the Netflix Series falsely imply that Ms. Banks possessed an understanding in 2003 that, to her knowledge, was not publicly articulated by anyone—including Ms. Sullivan herself—until the Netflix Series was about to stream.

106. The publicly available record confirmed this understanding as recently as 2020. On October 16, 2020, Ms. Sullivan appeared on a YouTube interview with Oliver Twixt, an ANTM superfan who has interviewed many former contestants. During that interview, Ms. Sullivan discussed what happened to her in Milan without referencing a sexual assault or indicating that she perceived the event to have been nonconsensual.

107. Ms. Banks recognizes the seriousness of Ms. Sullivan's account and does not take such allegations lightly. What she can say with certainty is that she had no awareness whatsoever that Ms. Sullivan's experience in Milan might have involved anything other than a regrettable, but consensual, encounter. That

understanding was the only one available to her—from the original episode as broadcast, from Ms. Sullivan's own public statements over two decades, and from every other publicly available source Ms. Banks knew of.  No one—including the documentary's producers during Ms. Banks' three-and-a-half-hour interview—ever told her otherwise.

### *Netflix Series Episode 1: The Manufactured Cliffhanger*

108.   The first episode of the Netflix Series sets up the emotional weight of what is to come.  An off-camera voice asks Ms. Sullivan, "Did you want to stay in the running?  Did you want to win it all?"  Ms. Sullivan replies: "I did until… until what happened in Milan.  And then I didn't care."

109.   Over flashbacks of the original ANTM episode, present-day Ms. Sullivan narrates: "I don't think I'd eaten anything at all or had any sleep.  I remember getting in the hot tub.  I remember April and Mercedes getting in the hot tub.  And then I just remember the guy looking at me, and I looked at him, and I was pretty drunk at that point."

110.   The music turns ominous.  The screen alternates between scenes from the original ANTM episode—Ms. Sullivan in the hot tub, later in bed with a man—and clips of Ms. Sullivan speaking in the present day in the Netflix Series.  She says: "Everything kind of after that is just a blur.  All I remember is just like . . . him on top of me.  I was blacked out.  No one did anything to stop it.  And it all got filmed.  All of it.  Every moment of it."

111.   With the viewer still absorbing this, the episode turns to Ms. Banks.  Ms. Loushy says: "A more difficult territory is Shandi."  Ms. Banks replies: "Shandi, okay."  Ms. Loushy asks: "You remember the story with Shandi?"  The episode shows Ms. Banks glance upward and hesitate, saying only "um," and the episode abruptly ends.

25

112.   The implication is devastating and deliberate: Ms. Banks cannot even remember the story of the woman who was assaulted on her show.

113.   This implication is false.  Ms. Banks remembers Ms. Sullivan well. She stood out as a remarkable young woman and talented aspiring model.  Ms. Banks also remembers the encounter in Milan as a matter of regret over infidelity. As far as she knew at the time, that was how everyone involved understood it—not as a sexual assault.  Before it aired, no one involved in making or clearing the episode—not the producers, the network executives that oversaw the show, or the network's standards-and-practices reviewers—told her that anyone regarded it as a sexual assault.

114.   The full footage of Ms. Banks' interview reveals two things the producers removed from the continuous sequence in which Ms. Banks is asked if she remembers Ms. Sullivan's story.  First, along with the upward glance and the "um," Ms. Banks nods—affirmatively, unmistakably—confirming that she remembers.  That nod was carved out of the sequence.

115.   Second, Ms. Banks goes on to say: "I do remember her story."  That response was cut off from the end.

116.   One piece of evidence was deliberately extracted; the other was simply silenced.  The producers had this footage.  They knew that revealing it to viewers at the end of the first episode of the Netflix Series would destroy the story they were trying to construct.  Instead, they made it appear that Ms. Banks was responding to Ms. Sullivan's present-day account of events that took place more than 20 years ago.  Thus, the producers made deliberate editorial decisions to suppress Ms. Banks' answers, take them out of context, and mislead the audience.

117.   In doing so, the producers deceptively portrayed Ms. Banks as having known and forgotten about what Ms. Sullivan now understands to be a sexual assault—a false characterization of Ms. Banks' understanding and statement.

*Netflix Series Episode 2: Defendants Falsely Portray Ms. Banks as Knowing of a Sexual Assault and Manipulating Ms. Sullivan Into Admitting to Cheating*

118.   Having manufactured the false impression that Ms. Banks knew and forgot that Ms. Sullivan suffered a sexual assault, the Netflix Series escalates in Episode 2 to an even more damaging set of falsehoods, including that Ms. Banks had real-time knowledge of an assault, did nothing to stop it, and then afterwards deliberately initiated a conversation to manipulate Ms. Sullivan into admitting to cheating.

119.   The second episode of the Netflix Series opens with unsettling music and alternates between a black screen and scenes from the original ANTM episode. Present-day Ms. Sullivan states: "I was hammered.  I think I had two bottles of wine by myself."  She explains that she "just remember[s] . . . little bits and pieces," including "being in the shower and then just sitting in the shower, and then we were in the bed."  She continues: "I was blacked out for a lot of it.  I didn't even feel sex happening, I just knew it was happening.  And then I passed out."

120.   The original ANTM footage then plays: a young Ms. Sullivan hunched on the edge of a bed, her back to the camera, crying with her head hanging down.  The Netflix Series continues with Ms. Sullivan's current commentary: "It all [f***ing] hit me.  It just flooded over me.  I just sat there and cried."  The Netflix Series continues with another cut to the original ANTM episode.  The other contestants hold and comfort her.  One whispers: "It's over.  It's over.  You don't let this take away your spirit."  Through this editing, the producers cause viewers of the Netflix Series to perceive Ms. Sullivan's emotional breakdown—understood by viewers at the time as flowing from her infidelity—into a reaction to a traumatic sexual assault.

121.   Even the journalist the producers used to comment on this episode of the Netflix Series confirms the original understanding.  Though she was not present during the original events, the journalist discussed the exchange Ms. Sullivan and

27

Ms. Banks had over coffee that the next day. The journalist explained that Tyra and the contestants were "talking about cheating."

122. But the producer of the Netflix Series used the journalist to turn that coffee discussion on its head. In addition to the sequence editing discussed above, the producers added a clip from the journalist in which she says: "The next day, Tyra has a girl's talk and it is not a coincidence that she starts talking about cheating."

123. The journalist was mistaken. Ms. Banks did not initiate the topic. The producers knew it and the original ANTM episode proves it. Contrary to what the Netflix Series suggests, Ms. Banks did not draw out the confession.

124. The ANTM original episode reveals that it was Ms. Sullivan who raised the subject. Ms. Sullivan turned to Ms. Banks and asked: "I have a personal question . . . have you ever cheated on anyone? Or had anyone cheat on you?" Ms. Banks did not introduce the topic. She responded to a question that Ms. Sullivan asked her.

125. The producers purposefully rearranged this entire sequence to depict Ms. Banks as raising the issue, not responding to it.

126. The interviewed journalist's assertion appears to be a reaction to the intentionally manipulated sequence the producers had constructed. Having orchestrated the journalist's reaction and manipulated the facts, Netflix and the producers then streamed that commentary to the world as though it represented the truth.

127. The producers compounded this by adding a comment from the journalist: "of course she's going to have producers in her ear." The implication is devastating: that before Ms. Banks sat down with Ms. Sullivan that morning, someone had pulled her aside and told her that Ms. Sullivan had been black-out

28

drunk and had been sexually assaulted.   There is no evidence that Ms. Banks was told any such thing—because she never was.

128.   Were that not enough, the producers also show Jay Manuel stating in his interview: "I know the girls, they were doing their evening hanging with the guys.  We were off.  And then we got word.  Shandi is having sex in the shower with a guy."  Mr. Manuel's reference to "we" is naturally understood by viewers to include Ms. Banks.  The Netflix Series presents his statement as proof that Ms. Banks was informed of all the details in real time.

129.   Ms. Banks has never denied that she was likely informed that Ms. Sullivan had participated in a sexual encounter the evening it occurred or the next day, she was not aware of the details.  And, of course, when Ms. Sullivan discussed it with Ms. Banks the next day, she only characterized it as a regrettable act of infidelity.  Again, Ms. Banks appreciates that Ms. Sullivan's understanding of the event is different today.  But Ms. Banks did not know that at the time of the events and nobody told Ms. Banks before or at the time she was interviewed for the Netflix Series.

### Episode 2: The "Executive Producer" Juxtaposition

130.   Episode 2 of the Netflix Series then reveals what the producers concealed in Episode 1.  Ms. Banks appears on screen.  The Netflix Series repeats Ms. Loushy asking: "Do you remember the story with Shandi?"  *This time*, it shows Ms. Banks nodding to confirm that she does.  But now the producers create another distortion.  Ms. Banks' full name appears alongside the title "Creator & Executive Producer" of ANTM.  It is in that context that viewers see Ms. Banks reply: "I do remember her story.  It's a little difficult for me to talk about production . . . because that's not my territory."

131.   The juxtaposition of Ms. Banks' title with this manipulated soundbite is calculated.  The on-screen title—"Executive Producer"—placed alongside Ms.

29

Banks' statement that "production . . . [is] not my territory" is designed to make her appear evasive and dishonest. The viewer is led to conclude that Ms. Banks is lying: that she knew what happened, that she failed to intervene, and that she is now trying to distance herself from responsibility.

132. But Ms. Banks was not disavowing her role on ANTM. She was distinguishing between her involvement in ANTM's creative vision, casting, and contestant performance evaluations, on the one hand, and the day-to-day production operations on the ground in Milan. Ms. Banks was not on set while filming took place at the contestants' Milan apartment. She did not direct video cameras. Her use of the word "production" referred to the operational production, not her executive role.

133. In her role, Ms. Banks reviewed and provided notes on initial and subsequent cuts of episodes. But she did not review all the raw footage from which those cuts were assembled—nor could she. The contestants were filmed by multiple cameras throughout most of the day. There were hundreds of hours of footage per episode.

134. To this day, Ms. Banks has never seen the full, unedited footage of that night. As experienced producers, Netflix and the producers certainly understood this entire process. The false narrative the producers created was not accidental.

135. Having created that false narrative, the producers exploited it. An off-camera voice then asks Ms. Sullivan: "Do you think production should have stopped it?" She replies: "I think . . . after getting out of the hot tub and like whatever happened after that, I think they should have [f***ing like, been like, all right, this has gone too far. Like, we got . . . we got to pull her out of this."

136. Notably, in her prior interview with Twixt, Ms. Sullivan recalled that someone from production did intervene during the encounter, stating: "I think we

30

also were making out in the shower, but I don't really remember that. I just remember getting dragged out of the shower by production. I don't remember why . . . Production guys were so freaking awesome."

### *Episode 2: Defendants Imply Ms. Banks Concealed an Assault*

137. Not satisfied with implying that Ms. Banks failed to stop a sexual assault, the producers went further—using manipulated clips to suggest she actively concealed what happened.

138. Ms. Banks appears on screen immediately after Ken Mok explains that the Milan footage was scaled back in a significant way. Seemingly in response to a question about Ms. Sullivan—though the question itself is not aired—Ms. Banks states: "I'm not head of story, that's Ken Mok. But I did become a master editor. It's important for people to know that we didn't put everything on TV."

139. The producers then show a clip of Jay Manuel and make it appear that he is contradicting Ms. Banks. As edited by the Netflix Series producers, Manuel suggests that footage was cut because of the regulatory attention that followed a Super Bowl halftime show wardrobe malfunction—implying that the cuts were not editorial judgments but efforts to suppress evidence of an assault.

140. While some edits were made by the team to address new network standards in the wake of the Super Bowl incident, the sequence in the Netflix Series is designed to falsely make it appear that Ms. Banks is admitting to having edited out evidence of a sexual assault, and also falsely make it appear that Manuel is exposing dishonesty.

### *The Producers Deliberately Concealed Their False Narrative from Ms. Banks During Her Interview*

141. The false impressions described above were not the product of mere artistic editing choices. They were the result of a deliberate strategy that began before Ms. Banks ever sat down for her interview.

31

142.   The producers knew, before the interview, that Ms. Banks had no knowledge that Ms. Sullivan perceived the Milan encounter as nonconsensual.  On information and belief, Ms. Sullivan had already sat for her own interview and described the events as an assault.  The producers chose not to share this with Ms. Banks.

143.   During Ms. Banks' three-and-a-half-hour interview, no one from the production team indicated that Ms. Sullivan had characterized what happened to her in Milan as a sexual assault.  Ms. Banks was not asked a single question that framed the encounter as nonconsensual.

144.   Because Ms. Banks did not know the Netflix Series would present the encounter as an assault, her answers could not have reflected that understanding.  The producers then manipulated her answers—given in the context of a discussion about infidelity and regret—and framed them as part of a discussion about sexual assault.

145.   Had Ms. Banks been told that Ms. Sullivan perceived her experience in Milan as an assault, she would have addressed it in that context.  She would have explained the seriousness with which she treated such issues.  And then she would have stopped the interview.

146.   That response would not have been hypothetical.  It would have been based on what Ms. Banks actually did during one cycle after a person on the crew reported directly to Ms. Banks that another regular member of the ANTM cast had engaged in a pattern of inappropriate sexual conduct during production of ANTM.  Ms. Banks immediately shared the report with other executives and ensured the issue was escalated to the network.  Ms. Banks acted promptly and gave the matter the serious attention it deserved.  In response, production was paused so the entire cast and crew could undergo sexual harassment training conducted by an outside expert.  Attendance was required for the entire team of approximately 100 people.

32

Separately, the individual identified in the report was confidentially reprimanded through appropriate channels.

147. The decision to withhold critical information from Ms. Banks was not an oversight. It was the mechanism they used to support the preconceived narrative they intended to construct. The intent is underscored by numerous other false and misleading representations throughout the Netflix Series—none of which the producers presented to Ms. Banks during her interview so that she could correct them. Nor did the producers do any fact checking with Ms. Banks before making their final edits to the Netflix Series.

148. The producers kept information from Ms. Banks because they wanted allegations and mischaracterizations to go unanswered by her. So, they never gave her the chance to respond.

149. As another example, had the producers informed Ms. Banks that part of the Netflix Series narrative would be that ANTM did not oversee contestants' careers post show, Ms. Banks would have explained that she made the deliberate choice not to create her own agency to do so because of the conflict of interest it would create. Ms. Banks did not want to be in the position of being compromised and making decisions on ANTM winners based on what she thought would be the most profitable for a modeling agency business in which she had personally invested funds in. She also felt that her agency would have been subject to legitimate criticism that her casting decisions were driven by considerations about who would be most commercially profitable, or who she just personally liked and would want to sign to her agency.

150. The structure of refusing to profit from the winners was intentional, even if imperfect. But the Netflix Series viewers learned none of this and were deprived of forming their own opinions because Defendants chose not to give Ms. Banks any opportunity to address this.

33

151.    Perhaps the most hurtful example involved Miss J. Alexander. Had the producers informed Ms. Banks that part of the Netflix Series narrative would include Miss J saying that Ms. Banks never visited him in the hospital, Ms. Banks would have explained that she had been living in Australia for 2 1/2 years. She would have shared the text revealing that on a New York trip, she reached out to Miss J to say she wanted to see him, but he never responded to that message. She would have shown lengthy text chains she was a part of where ANTM crew and cast members were all trying to figure out how to locate Miss J soon after his stroke. She would have shown how hard she tried to get in touch with Miss J personally when she had initially heard the news of his stroke. And she would have shown the text message that arrived from Miss J's family member who eventually texted back months later and apologized for not responding to Ms. Banks' texts and multiple calls sooner due to her being focused on getting him better. Ms. Banks would have explained that after that contact, she and Miss J spent three years communicating. They spoke live on the phone at least once. They exchanged voice notes, many photos, and video messages. They texted numerous times. As recently as Christmas Day 2025 Ms. Banks and Miss J exchanged holiday messages and he updated Ms. Banks about his improved health. She replied, "Yesssssss Can we speak this week?" They never spoke. Just weeks later, the Netflix Series streamed to a worldwide audience.

152.    Again, the producers deprived viewers of truth by withholding from Ms. Banks the information about what others had said in their Netflix interviews and not providing her with an opportunity to respond. There are numerous other examples.

153.    With the benefit of hindsight, none of this is a surprise. The producers needed Ms. Banks to answer as if Ms. Sullivan's experience in Milan involved only infidelity—because only those answers, stripped of context and reassembled, could

34

be made to look like evasion of a known assault.  And they repeated that pattern of deception over and over again on topics ranging from serious to petty. Concealment during the interview, manipulation in the editing room, and the decision not to do any fact checking with Ms. Banks were all part of the producers' overall strategy.

### *Ms. Banks Suffers Serious Harm*

154.   As was Defendants' intent, the public's reaction to the Netflix Series was swift, harsh, and directed squarely at Ms. Banks.  Viewers accepted the documentary's false narrative at face value: including that Ms. Banks knew a contestant had been sexually assaulted, did nothing to stop it, and could not even be bothered to remember it.

155.   Not surprisingly, viewers took to social media to express their disgust and outrage.

156.   For example:

157.  As a result, Ms. Banks has suffered significant harm and damage to the personal brand she has worked for decades to build and maintain throughout the world.

158.  Another example of harm to Ms. Banks' personal brand is reflected by the impact that has been suffered in some of her other businesses.  For example, Ms. Banks has invested millions of dollars into her ice cream business, SMiZE & DREAM, which operates in Sydney, Australia.  The producers needlessly featured SMiZE & DREAM, including footage of the store's flagship location in Sydney, in the Netflix Series' final episode.  Following the Netflix Series premiering on Netflix, the business's online rating plummeted from 4.6 to 3.6 after viewers flooded the site with retaliatory reviews parroting the documentary's false portrayal of how Ms. Banks handled and reacted to what happened to Ms. Sullivan.

159.  As a direct result of the producers' conduct and the extensive harm they have caused to her personal and professional reputation, Ms. Banks was forced to engage in substantial efforts and expense to mitigate the ongoing harm to her reputation.

***Ms. Banks' Pre-Litigation Efforts to Correct the Record***

160.　Before filing this action, Ms. Banks made serious and good-faith efforts to resolve this matter without litigation.

161.　On March 9, 2026, Ms. Banks' counsel sent letters to all Netflix and the producers.　In those letters, counsel called out that Ms. Banks' interview had been intentionally altered to advance a false narrative about her.　Ms. Banks' counsel requested that they preserve all documents relating to the Netflix Series. (Exhibit 6).

162.　On March 19, 2026, Ms. Banks' counsel sent Netflix a letter asking for an opportunity to review the unedited and uncut version of Ms. Banks' entire three-and-a-half-hour interview.　(Exhibit 7).

163.　In the March 19 letter, Ms. Banks' counsel explained that the Netflix Series had selectively edited Ms. Banks' interview to misconstrue her views on a variety of sensitive topics.　Counsel expressed Ms. Banks' hope that with access to the complete footage, the parties would "be able to work together to correct any mischaracterizations of Ms. Banks and reduce the serious reputational harm she has already suffered."　Ms. Banks offered to make her attorneys available to review the footage on Defendants' preferred schedule, and "under any reasonable circumstances that Netflix deems appropriate."

164.　Through counsel, Netflix declined Ms. Banks' request, stating that the footage was in the possession of EverWonder and Wise Child.　When Ms. Banks' counsel renewed the same request directed at EverWonder and Wise Child, Defendants' counsel again declined.

165.　They offered no explanation for their refusal.　There is no legitimate reason to deny Ms. Banks access to footage of her own interview—except to deprive the public of the truth that would be revealed by that footage.

166. Ms. Banks is confident that the complete, unedited footage of her interview will confirm what the existing evidence already demonstrates: that the producers intentionally constructed a false narrative that misrepresented Ms. Banks and mislead viewers. But because the Netflix and the producers have refused to provide access to the footage, she has been denied the ability to make the full truth public.

167. Left with no alternative, Ms. Banks brings this action to hold the producers accountable, to compel the production of the unedited footage they have refused to release to Ms. Banks, and to vindicate the reputation they deliberately impaired.

168. Most of all, the Netflix Series has used Ms. Sullivan's current account of sexual assault and weaponized it—portraying Ms. Banks as uncaring and orchestrating a sexual assault cover up. The producers clearly did not care what impact that would have on Ms. Banks, Ms. Sullivan, or on viewers—particularly those viewers who have been the victims of sexual assault. Not only is Ms. Banks entitled to vindication, the public is entitled to the truth. Ms. Banks is committed to giving them that opportunity, even if she must do so through the public forum of a courtroom.

169. As of the filing of this lawsuit, Ms. Banks cannot be certain whether Netflix was a knowing participant in the false and defamatory attacks against her or just the vehicle through which those lies were told to a worldwide audience. Either way, she is profoundly disappointed that the institution that she respected and trusted would have any involvement in causing her such serious harm.

### The Rights Agreement

### *The Rights Agreement and Its Protective Provisions*

170. On July 18, 2025—three months after her interview—Ms. Banks signed an Acknowledgment & Release Agreement (the "Rights Agreement") with

38

EverWonder.  EverWonder countersigned the Rights Agreement on July 21, 2025. (Exhibit 8).

171.  Though executed long after Ms. Banks' interview, the Rights Agreement purported to grant EverWonder the right to interview Ms. Banks; to film and record her likeness, image, voice, and name; and to incorporate the resulting material into the programming then under the working title of "On Top" (the "Programming").  The Rights Agreement authorized EverWonder to edit the Programming and to exhibit and license others to exhibit it, in whole or in part, throughout the world in perpetuity.

172.  The Rights Agreement contained a waiver of claims, under which Ms. Banks released the producer and its affiliates, licensees, and assigns from various claims.  That waiver, however, expressly excluded "claims arising out of Producer's gross negligence or willful misconduct."

173.  Critically, the Rights Agreement also imposed affirmative obligations on the producer.  It provided that Ms. Banks' material "may not be edited in such a way as to (i) portray [her] in a manner that constitutes actionable defamation" and that the producer would not "(ii) overdub or otherwise replace any words actually spoken by [her] in the recordings with other words that materially and objectively alter the meaning of [her] statements."

174.  It also prohibited the use of Ms. Banks' material in merchandising, commercial tie-ins, or endorsements without her prior written consent.  It expressly provided that "Producer **shall not use the Material** in any merchandising or commercial tie-ins or in a manner that constitutes an endorsement by [Ms. Banks] of any product, service or entity." (emphasis added).  The producers promised not to "use the Material separate or apart from the Programming beyond what is expressly permitted."

39

175. These were not boilerplate courtesies. They were bargained-for restrictions that defined the boundaries of what Ms. Banks authorized. The producers violated each of them.

### Breach of the Rights Agreement's Protective Provisions by Defaming Ms. Banks

176. The Rights Agreement imposed obligations on both parties: Ms. Banks agreed to waive certain claims; Defendants agreed not to edit her material in a manner constituting defamation or altering the meaning of her statements. These obligations were mutual and interdependent.

177. The producers breached the no-defamation clause and the no-word-replacement clause—both material obligations of the Rights Agreement—before and at the time the Netflix Series was released. Those breaches were not minor or technical. They go to the heart of the bargain: Ms. Banks agreed to participate and to waive claims in exchange for, among other things, the assurance that her material would not be used to defame her or to alter the meaning of her words.

### Breach of the Rights Agreement by Exceeding Its Overall Scope

178. The Rights Agreement defines the "Programming" only by its working title: "On Top (w/t)." The Rights Agreement contains no description of the Programming's content, editorial approach, tone, or subject matter. It does not state that the Programming will accuse Ms. Banks of covering up a sexual assault. It does not state that the Programming will incorporate footage from productions outside Ms. Banks' interview. It does not describe a three-episode attack. The term "Programming" is, on its face, ambiguous.

179. However, the parties' intention regarding the meaning of the term "Programming" is readily ascertainable. The pitch deck described the project as "not a takedown, but a thoughtful, in-depth reflection on [ANTM's] influence, evolution, and impact." It represented that the project would be "equal parts

40

authoritative and celebratory" and Mr. Adler represented that Netflix was "aligned with this approach." The producers portrayed the project as one that would show ANTM and Ms. Banks in a positive light. The finalized topic list contained no reference to sexual assault, Ms. Sullivan, or any allegation of misconduct. Taken together, this evidence establishes that the "Programming" the parties understood Ms. Banks to be authorizing was a retrospective of ANTM's cultural legacy—not a sustained editorial attack accusing her of complicity in a sexual assault.

180. The Netflix Series that was actually produced bears no resemblance to the Programming as the parties understood it. It was retitled "Reality Check." It is built on fabricated editorial sequences. It accuses Ms. Banks of knowingly allowing a sexual assault and exploiting the victim's trauma. Because the Netflix Series materially departed from the Programming that Ms. Banks authorized, her waiver of claims does not extend to the Netflix Series as produced.

### *Unauthorized Use of Ms. Banks' Image and Likeness to Endorse a Music Album*

181. The Rights Agreement defines "PRODUCER" to include EverWonder and "its affiliates, parents, subsidiaries, assigns and licensees." The Rights Agreement defines the "Material" to include Ms. Banks' likeness, image, voice, name, actions, activities, and statements as captured in the interview.

182. The Rights Agreement defines the "Programming" as the "programming currently entitled 'On Top' (w/t)." The producers had already represented that "On Top" was to be a "three-hour Netflix docuseries," as described in their Pitch Materials.

183. And, as noted above, the grant of rights under the Rights Agreement is expressly limited. The Rights Agreement authorizes PRODUCER (and through it, PRODUCER's affiliates, parents, subsidiaries, assigns and licensees) to incorporate the Material into the Programming and to use the Material for the "in-

context publicity and promotion of the Programming." The grant does not authorize use of the Material in any other product, on any other product's packaging, or in connection with the promotion of any product other than the Programming itself. Rather, the Rights Agreement contains the following express restrictions:

- **Merchandising and tie-in restriction.** The Rights Agreement provides that, "Notwithstanding anything to the contrary herein, Producer shall not use the Material in any merchandising or commercial tie-ins or in a manner that constitutes an endorsement by me of any product, service or entity (including, without limitation, Producer), without my prior written consent in each instance."

- **Separate-or-apart restriction.** The Rights Agreement further provides that, "Producer agrees it will not use the Material separate or apart from the Programming beyond what is expressly permitted herein without my prior written consent in each instance."

184. By the express terms of the Rights Agreement, these restrictions bind not only EverWonder but also EverWonder's "affiliates, parents, subsidiaries, assigns and licensees." Any person or entity in the licensing chain receiving rights from EverWonder received those rights subject to, and limited by, these restrictions.

185. Ms. Banks has not granted, in writing or otherwise, the prior written consent contemplated by the Rights Agreement for any use of the Material in commercial merchandising or tie-ins, on any product cover or packaging, in connection with the promotion of any product other than the Programming itself, or in any manner constituting an endorsement of any other product, service, or entity.

186. Nevertheless, Defendants Netflix and Netflix Music released a commercial sound recording titled Reality Check: Inside America's Next Top Model (Soundtrack from the Netflix Documentary Series) (the "Album"). The Album is credited to composers Jasha Klebe, Benny Reiner, and Empara Mí.

187. The Album is a discrete commercial product, separately released, separately marketed, and separately monetized from the Netflix Series itself. The Album is offered for sale and streaming on Apple Music, Spotify, Amazon Music, and other digital music distribution platforms, where consumers may purchase, stream, save, share, and consume it independently of any viewing of the Netflix Series.

188. The Album Cover consists of a digital collage that prominently and centrally features a still photographic image of Ms. Banks (the "Banks Image"). The Banks Image was extracted, derived, or composited from footage captured by EverWonder during the April 18, 2025, interview and therefore constitutes "Material" within the meaning of the Rights Agreement.

189. The Banks Image as displayed on the Album Cover:

    a) is the single largest figure on the Album Cover, occupying the upper-center quadrant directly above the Album title;

    b) is rendered at a scale substantially larger than every other image appearing on the Album Cover, including the images of three other individuals depicted at materially smaller scale in the lower portion of the composition;

    c) is centered on the vertical axis of the Album Cover, positioning Ms. Banks as the visual focal point of the composition;

    d) depicts Ms. Banks in a posed, photographic portrait, fully recognizable, and is not stylized, abstracted, caricatured, or otherwise transformed from her ordinary appearance; and

e) occupies the dominant visual position conventionally occupied, in commercial album packaging, by the featured artist or principal endorser of the work.

190. The composers credited on the Album—Klebe, Reiner, and Empara Mí—do not appear visually on the Album Cover at all; their names appear only as text at the bottom of the composition, in type substantially smaller than the title and visually subordinate to the Banks Image.

191. On information and belief, EverWonder licensed the Netflix Series and associated footage, including the underlying interview footage from which the Banks Image was taken, to Netflix pursuant to a written delivery, license, or production services agreement (the "Delivery Agreement"). The Delivery Agreement was entered for the purpose of permitting Netflix to exhibit, distribute, market, and exploit the Netflix Series and its elements on the Netflix service and through Netflix's affiliates.

192. On information and belief, Netflix in turn made the interview footage, or the Banks Image extracted therefrom, available to Netflix Music for use in connection with the Album, whether pursuant to a written inter-affiliate license, an internal rights management policy, or an informal authorization.

193. Ms. Banks never consented—not in writing, not orally, not implicitly—to her likeness or image to be used to promote the Album.

## FIRST CLAIM FOR RELIEF – FALSE LIGHT

*(Against EverWonder, Loushy, and Sivan)*

194. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 193 as if set forth fully herein.

195. On or about February 16, 2026, Defendants EverWonder, Loushy, and Sivan (the "Producer Defendants") published the Netflix Series on Netflix's streaming platform, making it available to a worldwide audience of millions.

44

196. As more fully alleged above, through the cumulative effect of deliberate editorial manipulation—including the surgical excision of exculpatory footage, the fabrication of false sequences, the strategic concealment of information during Ms. Banks' interview, and the juxtaposition of unrelated clips to manufacture false impressions— the Producer Defendants placed Ms. Banks before the public in a false light that would be highly offensive to a reasonable person, and was highly offensive to Ms. Banks.

197. Specifically, the Netflix Series placed Ms. Banks in a false light in that it conveyed that Ms. Banks: (a) knew that a contestant had been sexually assaulted on ANTM; (b) was aware of the assault as it was happening and failed to intervene; (c) deliberately manipulated the victim under the guise of a caring mentor; (d) lied about her role in production to distance herself from responsibility; (e) actively concealed the assault by controlling the editing of the footage; and (f) ultimately could not even be bothered to remember that any of it had occurred.

198. The light in which Ms. Banks was placed is false in every material respect. Ms. Banks did not know that Ms. Sullivan may have been sexually assaulted. As discussed more fully above, she was not aware of all the details of the sexual encounter as it was happening—she was not on set during the apartment shoot and did not make real-time production decisions that night. She did not initiate the conversation with Ms. Sullivan about cheating—Ms. Sullivan did. She did not mislead viewers about her role—she accurately distinguished her creative responsibilities from the day-to-day physical production operations on the ground. She did not conceal any sexual assault—she has never seen the full, unedited footage of Ms. Sullivan's experience in Milan. And she remembers Ms. Sullivan well.

199. The Producer Defendants created this false light portrayal through affirmative acts of manipulation, not through the exercise of legitimate editorial

45

judgment. They possessed footage that directly contradicted the false impression they were constructing—including Ms. Banks' affirmative nod, her statement "I do remember her story," and the original ANTM footage showing Ms. Sullivan initiating the cheating conversation—and they deliberately suppressed, rearranged, or excised that footage. Upon information and belief, Ms. Sullivan had already been interviewed by the time Ms. Banks sat for her three-and-a-half-hour interview, and so they also withheld from Ms. Banks the fact that Ms. Sullivan had characterized what happened to her in Milan as a sexual assault—and then edited Ms. Banks' uninformed responses to make them appear evasive and dishonest. The Producer Defendants at no point contacted Ms. Banks to inform her of Ms. Sullivan's evolved characterization to allow Ms. Banks to meaningfully respond.

200. The Producer Defendants acted with actual malice. They knew that the overall false light created by the Netflix Series was false, or acted with reckless disregard for whether it was true or false, as evidenced by the specific acts of editorial manipulation described in detail above. The Producer Defendants had the truth in their possession—in the form of the unedited interview footage and the original ANTM episodes—and chose fabrication over fact. The evidence of actual malice includes, but is not limited to, the following:

a) The Producer Defendants had access to Ms. Banks' complete three-and-a-half-hour interview and therefore knew that she provided a full and responsive answer to the question about Ms. Sullivan;

b) The Producer Defendants possessed the footage of Ms. Banks' affirmative nod and her statement "I do remember her story," and deliberately suppressed both;

c) The nod was carved out of the middle of a continuous sequence—an act of surgical editorial precision that could not have been accidental;

d) The Producer Defendants chose to end Episode 1 on a manufactured cliffhanger designed to leave viewers with the false impression that Ms. Banks knew about but could not remember Ms. Sullivan's story of assault;

e) The Producer Defendants rearranged the coffee meeting footage to make it appear that Ms. Banks initiated the discussion about cheating, when the original ANTM episode shows that Ms. Sullivan raised the subject first. The Producer Defendants had the original footage and knew the truth;

f) The Producer Defendants created the impression that Ms. Banks was aware of a sexual assault and worked to cover it up;

g) The Producer Defendants juxtaposed Ms. Banks' on-screen title— "Creator & Executive Producer"—with her statement that "production . . . is not my territory" to make her appear evasive and dishonest, when in context she was distinguishing her creative role from the physical production operations on the ground in Milan; and

h) The Producer Defendants withheld from Ms. Banks, during her three-and-a-half-hour interview, the fact that Ms. Sullivan had characterized the Milan encounter as a sexual assault—and then edited Ms. Banks' uninformed responses, given in the context of a discussion about infidelity, to make them appear evasive in the context of a discussion about sexual assault.

47

201.   As a direct and proximate result of The Producer Defendants' conduct, Ms. Banks has suffered substantial harm, including significant mental anguish, loss of personal dignity, public humiliation, and the expenditure of significant resources to correct the false light in which Defendants placed her, all in an amount to be proven at trial, but not less than the jurisdictional minimum of this Court.

202.   The Producer Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Ms. Banks' rights such that an award of punitive damages is appropriate.

## SECOND CLAIM FOR RELIEF – DEFAMATION BY IMPLICATION

*The False Impression That Ms. Banks Forgot An Assault*
*(Against EverWonder, Loushy, and Sivan)*

203.   Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 193 as if set forth fully herein.

204.   On or about February 16, 2026, The Producer Defendants published the Netflix Series on Netflix's streaming platform.

205.   Through deliberate editorial manipulation, The Producer Defendants created the false and defamatory implication that Ms. Banks had known that Ms. Sullivan was sexually assaulted during the filming of ANTM and had forgotten about it entirely.  By presenting this implication immediately after Ms. Sullivan's account of her assault, The Producer Defendants conveyed that Ms. Banks was so indifferent to what had happened to a contestant on ANTM, her own show, that she could not even be bothered to remember it.

206.   The Producer Defendants achieved this by editing the final moments of Episode 1 to show Ms. Banks glancing upward, hesitating, and saying "um" in response to a question about Ms. Sullivan's story, and then abruptly cutting the episode to black.  The Producer Defendants removed two pieces of footage from that same continuous sequence: Ms. Banks' affirmative nod—carved out of the middle—and her statement "I do remember her story"—cut off from the end.

207.   The implication is of and concerning Ms. Banks.   The implication purports to ascribe knowledge and conduct to Ms. Banks.

208.   The implication is factual and is reasonably understood as factual—specifically, as an assertion that Ms. Banks knew that Ms. Sullivan had been assaulted and that she did not remember it.

209.   The implication is false.   Ms. Banks remembered Ms. Sullivan well. She was not aware that anyone had come to understand the events in Milan to be a sexual assault or that Ms. Sullivan had characterized it that way to the Netflix Series producers.   And the footage Defendants possessed—and suppressed—proves it.

210.   The implication is defamatory because it tends to expose Ms. Banks to public contempt, ridicule, and aversion by portraying her as a person who was indifferent to a sexual assault that occurred in connection with her own show—a characterization that is fundamentally incompatible with public trust and that has caused immeasurable harm to her personal and professional reputation.

211.   The implication is defamatory per se because it tends to injure Ms. Banks in her profession and business as a television host, producer, actor, brand ambassador, entrepreneur, and public figure whose commercial value depends on public trust and credibility.   Ms. Banks has also previously taught courses on personal branding at the Stanford Graduate School of Business and having been unknowingly coerced into participating in a project dead set on destroying hers has damaged her credibility as an expert in that space.   The portrayal of Ms. Banks as indifferent to a contestant's sexual assault has a natural tendency to cause others to refuse to associate or do business with her.   This is especially true given that the implication (i.e., that Ms. Banks knew about the sexual assault of a female contestant on her own show and forgot about it) directly undermines Ms. Banks' hard-earned legacy developed over three decades as a champion for women and girls.

212.    The Producer Defendants intended and endorsed the false implication. For example, the nod was not accidentally omitted—it was carved out of the middle of a continuous sequence, requiring at least two deliberate editorial decisions.  The "I do remember her story" response was not inadvertently truncated—it was cut to manufacture a cliffhanger.  Defendants possessed the full footage, understood that it contradicted the impression they were creating, and chose to suppress it.

213.    The Producer Defendants published the defamatory implication with actual malice—that is, with knowledge of its falsity or with reckless disregard for whether it was true or false.  The evidence of actual malice includes, but is not limited to, the following:

    a) The Producer Defendants had access to Ms. Banks' complete three-and-a-half-hour interview and therefore knew that she provided a full and responsive answer to the question about Ms. Sullivan;

    b) The Producer Defendants possessed the footage of Ms. Banks' affirmative nod and her statement "I do remember her story," and deliberately suppressed both;

    c) The nod was carved out of the middle of a continuous sequence— an act of surgical editorial precision that could not have been accidental; and

    d) The Producer Defendants chose to end Episode 1 on a manufactured cliffhanger designed to leave viewers with the false impression that Ms. Banks knew about but could not remember Ms. Sullivan's story of assault.

214.    As a direct and proximate result of The Producer Defendants' false and defamatory implication, Ms. Banks is likely to suffer substantial economic

damages, including loss future business opportunities, loss of business income, other compounding losses as will be shown at trial.

215.   As a further direct and proximate result, Ms. Banks has suffered severe reputational harm and has been required to expend considerable resources to mitigate that harm.

216.   As a further direct and proximate result, Ms. Banks has also suffered significant mental anguish.

217.   Ms. Banks is, therefore, entitled to an award of general and special damages, including for assumed damages, all in an amount to be proven at trial, but not less than the jurisdictional minimum of this Court.

218.   The Producer Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Ms. Banks' rights such that an award of punitive damages is appropriate.

## THIRD CLAIM FOR RELIEF – DEFAMATION BY IMPLICATION

*The False Impression That Ms. Banks Knew of the Assault and Failed to Act*
*(Against EverWonder, Loushy, and Sivan)*

219.   Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 193 as if set forth fully herein.

220.   On or about February 16, 2026, The Producer Defendants published the Netflix Series on Netflix's streaming platform.

221.   Through manipulative editing, the fabrication of false sequences, the juxtaposition of unrelated clips, and the strategic withholding of information from Ms. Banks during her interview, The Producer Defendants created the false and defamatory implication that Ms. Banks: (a) had contemporaneous knowledge that Ms. Sullivan was being sexually assaulted during the filming of ANTM Cycle 2 in Milan; (b) deliberately initiated a conversation about cheating to manipulate Ms. Sullivan into a confession; (c) failed to take any steps to intervene or stop the

51

assault; and (d) subsequently concealed the assault by controlling the editing of the footage.

222.   The implication is of and concerning Ms. Banks.  It is created through manipulatively edited footage of Ms. Banks' own interview, through the rearrangement of original ANTM footage, through commentary by individuals who were not present during the relevant events, and through the deliberate juxtaposition of Ms. Banks' statements with Ms. Sullivan's present-day account of assault.

223.   The Statements and implication are also defamatory per se because on their face they malign and prejudice Ms. Banks in her trade, business, or profession. The implication is factual and is reasonably understood as factual—specifically, as an assertion that Ms. Banks knew a contestant was being sexually assaulted, was aware of it in real time or was promptly briefed about the nonconsensual nature of it, chose not to act, and later concealed what she knew.

224.   The implication is false.  Ms. Banks did not know that Ms. Sullivan perceived the Milan encounter as a sexual assault until she viewed the Netflix Series on February 15, 2026.  She was not on set during the filming of the encounter in the apartment.  She was not informed of the complete details of the encounter. She did not initiate the conversation with Ms. Sullivan about cheating—Ms. Sullivan did, as the original ANTM episode confirms.  She did not see any edits of the Milan footage until at least three months after filming.  And she has never seen the full, unedited footage.

225.   The implication is defamatory because it accuses Ms. Banks of knowing that a contestant under her care was being sexually assaulted and choosing to do nothing—and then covering it up.  This accusation tends to expose Ms. Banks to public hatred, contempt, and disgrace, and has in fact caused precisely that reaction, as detailed above.

226. The implication is defamatory per se because it tends to injure Ms. Banks in her profession and business by portraying her as a person who would knowingly allow a sexual assault to occur on her show and then conceal it—a characterization that is incompatible with the trust required of a television host, producer, and public figure. This is especially true given that the implication (i.e., that Ms. Banks knew about the sexual assault of a female contestant on her own show and forgot about it) directly undermines Ms. Banks' hard-earned legacy as a champion for women and girls in the industry.

227. The Producer Defendants intended and endorsed the false implication, as evidenced by the following specific acts of editorial manipulation:

a) The Producer Defendants rearranged the coffee meeting footage to make it appear that Ms. Banks initiated the discussion about cheating, when the original ANTM episode shows that Ms. Sullivan raised the subject first. The Producer Defendants had the original footage and knew the truth;

b) The Producer Defendants created the impression that Ms. Banks was aware of a sexual assault and worked to cover it up;

c) The Producer Defendants juxtaposed Ms. Banks' on-screen title— "Creator & Executive Producer"—with her statement that "production . . . is not my territory" to make her appear evasive and dishonest, when in context she was distinguishing her creative role from the day-to-day physical production operations on the ground in Milan; and

d) The Producer Defendants withheld from Ms. Banks, during her three-and-a-half-hour interview, the fact that Ms. Sullivan had characterized the Milan encounter as a sexual assault—and then edited Ms. Banks' uninformed responses, given in the context of a

53

discussion about infidelity, to make them appear evasive in the context of a discussion about sexual assault.

228.   The Producer Defendants published the defamatory implication with actual malice—that is, with knowledge of its falsity or with reckless disregard for whether it was true or false—as evidenced by the specific acts enumerated above and the facts alleged in detail throughout this Complaint.

229.   As a direct and proximate result of The Producer Defendants' false and defamatory implication, Ms. Banks is likely to suffer substantial economic damages, including loss future business opportunities, loss of business income, other compounding losses as will be shown at trial.

230.   As a further direct and proximate result, Ms. Banks has suffered severe reputational harm and has been required to expend considerable resources to mitigate that harm.

231.   In view of the foregoing, Ms. Banks is entitled to actual, assumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

232.   As a further direct and proximate result, Ms. Banks has also suffered significant mental anguish.

233.   Ms. Banks is, therefore, entitled to an award of general and special damages, including for assumed damages, all in an amount to be proven at trial, but not less than the jurisdictional minimum of this Court.

234.   The Producer Defendants' conduct was willful, malicious, and undertaken with conscious disregard for Ms. Banks' rights such that an award of punitive damages is appropriate.

## FOURTH CLAIM FOR RELIEF – BREACH OF CONTRACT
*(Against EverWonder)*

54

235. Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 193 as if set forth fully herein.

236. On July 18, 2025, Ms. Banks and EverWonder entered into the Rights Agreement, a valid and binding contract governed by New York law.

237. The Rights Agreement imposed affirmative obligations on EverWonder, including: (a) that Ms. Banks' material "may not be edited in such a way as to portray [her] in a manner that constitutes actionable defamation"; (b) that EverWonder would not "overdub or otherwise replace any words actually spoken by [her] in the recordings with other words that materially and objectively alter the meaning of [her] statements"; (c) that Ms. Banks' material would not be used in merchandising, commercial tie-ins, or endorsements without her prior written consent; and (d) that Ms. Banks' material would not be used "separate or apart from the Programming beyond what is expressly permitted" without her prior written consent.

238. Ms. Banks performed her obligations under the Rights Agreement. She participated in the interview, provided the material, and signed the agreement.

239. EverWonder breached the Rights Agreement by, among other things: (a) editing Ms. Banks' material in a manner that constitutes actionable defamation, as alleged in Counts Two and Three; (b) excising Ms. Banks' words and gestures and replacing the resulting gaps with silence, cuts to black, and fabricated sequences that materially altered the meaning of her statements; (c) using Ms. Banks' material in connection with a product—the Music Album—that materially departed from the Programming authorized under the Rights Agreement.

240. As a direct and proximate result of EverWonder's breach, Ms. Banks has suffered damages including the costs of mitigating the harm caused by the breach.

## FIFTH CLAIM FOR RELIEF – FALSE ENDORSEMENT UNDER SECTION 43(a) OF THE LANHAM ACT

*15 U.S.C. § 1125(a)*
*(Against EverWonder, Netflix, and Netflix Music)*

241.   Plaintiff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1 through 193 as if set forth fully herein.

242.   Ms. Banks is a world-famous supermodel, television personality, and entrepreneur whose name, image, and likeness are uniquely and unmistakably associated with her in the minds of the consuming public.

243.   As alleged above, the Album is a discreet commercial product from the programming authorized by the Rights Agreement—marketed, monetized, and offered for sale and streaming separately from and independent of the Netflix Series.

244.   The Banks Image prominently featured on the Album Cover was taken from the footage captured during Ms. Banks interview and constitutes Material under the terms of the Rights Agreement.

245.   By virtue of the licensing chain alleged above, both Netflix and Netflix Music are "assigns and licensees" of EverWonder within the meaning of the Rights Agreement.  The rights each received with respect to the Material were granted subject to, and limited by, the express restrictions as described above, including the merchandising and tie-in restriction, the endorsement restriction, and the separate-or-apart restriction.

246.   Nobody sought, and Ms. Banks did not grant, the prior written consent required by the Rights Agreement for the use of the Banks Image on the Album Cover or in connection with the marketing of the Album.

247.   EverWonder is the sole originating source of the Material and the only defendant that possesses, controls, or licenses out the underlying interview footage from which the Banks Image was extracted. No use of the Banks Image by Netflix

or Netflix Music could have occurred without EverWonder's delivery of, or grant of access to, that footage.

248.   EverWonder is a sophisticated commercial party engaged in the production of documentary programming for distribution by major streaming platforms, including Netflix. EverWonder drafted, or had drafted on its behalf by counsel, the Rights Agreement at issue here.  EverWonder knew, or in the exercise of ordinary care had reason to know, the scope and the limits of the rights it acquired from Banks under the Rights Agreement.

249.   On information and belief, EverWonder represented and warranted to Netflix in the Delivery Agreement that all necessary releases, clearances, and consents had been obtained for the use of the Material in connection with the Netflix Series and its exploitation.  On information and belief, those representations and warranties either: (i) did not disclose, or affirmatively misrepresented the scope of, the merchandising, endorsement, and separate-or-apart restrictions in the Rights Agreement; or (ii) accurately disclosed those restrictions, in which case Netflix and Netflix Music proceeded with the Album Cover use in knowing disregard of them.

250.   EverWonder delivered the interview footage to Netflix in a form readily susceptible to extraction of still images for use in commercial packaging, promotional material, and merchandising, and did so with knowledge of customary industry practice that streaming-service licensees routinely produce soundtrack albums and other tie-in products bearing imagery drawn from licensed documentary content.

251.   EverWonder thereby intentionally induced, or knowingly facilitated and continued to supply the means for, Netflix's and Netflix Music's unauthorized use of the Banks Image on the Album Cover and in the marketing of the Album.

252.   Netflix is the principal commercial exploiter of the Netflix Series. Netflix exhibits and promotes the Netflix Series on the Netflix streaming service,

57

controls the marketing strategy and rollout of the Netflix Series, and directs the activities of its affiliated entities (including Netflix Music) with respect to ancillary products derived from Netflix programming.

253. On information and belief, Netflix approved, directed, or had final authority over the decision to release the Album, the selection of Album Cover for the Album, the inclusion of the Banks Image on the Album Cover, and the marketing and promotion of the Album on Netflix's own platforms and through Netflix's social media, email, and advertising channels.

254. On information and belief, Netflix and Netflix Music share senior personnel, marketing functions, legal review processes, and rights administration functions with respect to soundtrack releases tied to Netflix programming, such that the decision to release the Album and to feature the Banks Image on the Album Cover was effectively a joint decision of Netflix and Netflix Music.

255. On information and belief, Netflix uses or has used the Album Cover, including the Banks Image, in its own marketing materials promoting the Album and the Netflix Series, including without limitation on the Netflix service's music, soundtrack, or related pages; in social media posts; in email communications to subscribers; and in algorithmic recommendations.

256. Netflix is itself an "affiliate, parent, subsidiary, assign or licensee" of EverWonder within the meaning of the Rights Agreement and is bound by the Rights Agreement's restrictions accordingly. The use of the Banks Image on the Album Cover exceeds the scope of any rights granted under the Rights Agreement.

257. Netflix Music is the entity that released the Album as a commercial sound recording. Netflix Music is identified or implicated as the issuing label or releasing entity on the digital storefronts and streaming platforms where the Album is offered.

258. Netflix Music selected, approved, or caused the selection and approval of the Album Cover, including the prominent and central placement of the Banks Image. Netflix Music caused the Album Cover to be transmitted to digital storefronts and streaming platforms for display as the Album's principal point-of-sale image.

259. Netflix Music is, by virtue of the licensing chain alleged above, an "affiliate, subsidiary, assign or licensee" of EverWonder within the meaning of the Rights Agreement, and its use of the Banks Image on the Album Cover is constrained by the same merchandising, endorsement, and separate-or-apart restrictions that bind EverWonder.

260. Netflix Music's use of the Banks Image on the Album Cover is a direct use, in commerce, of Ms. Banks' likeness in connection with the offering for sale and sale of a commercial product.

261. The Album Cover is not displayed solely as expressive content internal to the Netflix Series. It functions as the principal point-of-sale identifier for the Album as a commercial product. The Album Cover is the image consumers encounter as the Album's thumbnail or tile on digital storefronts and streaming services; it appears adjacent to "Buy," "Add," "Save," "Play," and "Share" controls; it is the image displayed on consumers' devices when the Album is played; and it is the image reproduced in algorithmic recommendations, playlists, social media previews, and advertising for the Album.

262. By placing the Banks Image in the dominant position on the Album Cover, Defendants caused Ms. Banks' likeness to function as a source identifier for the Album, signaling to consumers the identity, origin, character, and endorsement of the product offered for sale.

263. Defendants selected the Banks Image for this prominent placement with knowledge of Ms. Banks' fame, her identification with ANTM, and the

commercial value of her implied association with the Album. On information and belief, Defendants did so for the purpose of leveraging Ms. Banks' recognition and commercial drawing power to attract consumer attention to, and to drive consumer transactions involving, the Album.

264. These promotional uses of Ms. Banks' identity were likely to cause, and did cause, confusion as to whether Ms. Banks endorsed, sponsored, approved of, or was affiliated with the Album or the Netflix Series promotional campaign.

265. That likelihood of confusion arises from, among other things:

a) Ms. Banks' extraordinarily high level of public recognition among the relevant consumer population;

b) the close and well-established public association between Ms. Banks and ANTM, such that the appearance of her image on a product bearing the ANTM name reinforces, rather than dispels, the inference of authorized association;

c) the dominant scale and central placement of the Banks Image on the Album Cover, which corresponds to industry conventions signaling endorsement, headlining artist status, or featured-personality status in album packaging;

d) the lack of any disclaimer, legend, or visual cue on the Album Cover indicating that Ms. Banks does not endorse, sponsor, or approve the Album;

e) the ordinary commercial expectation, well established in the music and entertainment industries, that the use of a celebrity's image on the cover of a commercial sound recording occurs only with that celebrity's authorization; and

f) the fact that the Banks Image is more prominent on the Album Cover than the images or names of the persons actually responsible

60

for the Album's musical content, inverting the visual hierarchy that would ordinarily signal authorship and reinforcing the inference that Ms. Banks' involvement is featured, principal, or endorsing in nature.

266. The subject matter of the Netflix Series—and, derivatively, of the Album as its soundtrack—could be communicated to consumers through numerous alternative cover designs that would not place the Banks Image in the dominant, source-identifying position. The Album title itself, the prominent Netflix branding, the program-related iconography depicted on the Album Cover Art (including the stylized television monitor), and the credited composers' names, are sufficient to identify the Album's subject matter to consumers.

267. Defendants' decision to place the Banks Image in the dominant position on the Album Cover was not necessary to identify the subject matter of the Album and was not undertaken for any genuine expressive purpose internal to the Album's musical content. It was a commercial design choice intended to function as, and that does function as, a marketing and source-identifying device.

268. Independent of the foregoing, Defendants are each contractually bound by the merchandising, endorsement, and separate-or-apart restrictions of the Rights Agreement, and have therefore agreed not to use Ms. Banks' likeness in the manner reflected on the Album Cover Art.

269. Therefore, Defendants have violated Ms. Banks' rights under 15 U.S.C. § 1125(a).

270. Defendants' unauthorized use of the Banks Image on the Album Cover has caused, and unless enjoined will continue to cause, injury to Ms. Banks, including without limitation:

a) Diminution in the value of Ms. Banks' right to control the commercial use of her name, image, and likeness, and

61

corresponding dilution of the selective and deliberate licensing practice through which she has historically protected that value;

b) Compelled commercial association with a sound recording, with composers, and with a commercial release that Ms. Banks did not select, did not approve, and would not have approved;

c) Loss of the licensing fees Defendants would have been required to pay had they sought, and had Ms. Banks been willing to grant, authorization for the use; and

d) Harm to Ms. Banks' reputation and goodwill arising from the implication that she lends her endorsement indiscriminately or for purposes outside her control.

271. Defendants' conduct was undertaken willfully, knowingly, and with reckless disregard for Ms. Banks' rights. Each defendant either drafted, signed, or received notice of the Rights Agreement and its express restrictions, and each defendant either knew or had reason to know that the use of the Banks Image on the Album Cover was unauthorized and prohibited under the Rights Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants as follows:

On the First Claim for Relief:

a) Award Plaintiff compensatory damages in amounts to be proven at trial;

b) Award Plaintiff punitive and exemplary damages in amounts to be proven at trial.

On the Second and Third Claims for Relief:

62

a) Award Plaintiff compensatory, actual, and assumed damages in amounts to be proven at trial;

b) Award Plaintiff special damages in amounts to be proven at trial;

c) Award Plaintiff punitive and exemplary damages in amounts to be proven at trial.

On the Fourth Claim for Relief:

a) Award Plaintiff compensatory damages in amounts to be proven at trial.

On the Fifth Claim for Relief:

a) Issuance of an injunction barring the use of the Banks Image—or any likeness of Ms. Banks derived from the interview footage—on or in connection with the Album, the Album Cover, or any other product, packaging, or advertising, and affirmatively requiring Netflix and Netflix Music to remove and cease distributing the existing Album Cover across all storefronts and platforms;

b) An accounting and disgorgement of profits from the Album;

c) Award of Ms. Banks' actual damages;

d) Award of damages enhancement pursuant to statute;

e) Award of attorneys' fees.

On All Claims for Relief:

a) Award of pre- and post-judgment interest, as allowed by law;

b) Award of litigation costs pursuant to statute;

c) Such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims, as to all issues so triable.

63

Dated:       June 13, 2026

/s/ *Mitchell Langberg*

MITCHELL LANGBERG
Thomas A. Clare, P.C. (*pro hac vice forthcoming*)
Megan McGuiggan (*pro hac vice forthcoming*)
Carolyn Wesnousky (*pro hac vice forthcoming*)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7401
mitch@clarelocke.com
tom@clarelocke.com
megan.mcguiggan@clarelocke.com
carrie@clarelocke.com
*Attorneys for Plaintiff, Tyra Banks*