GIBSON, DUNN & CRUTCHER LLP
JAY P. SRINIVASAN, SBN 181471
jsrinivasan@gibsondunn.com
ILISSA SAMPLIN, SBN 314018
isamplin@gibsondunn.com
ZACHARY C. FREUND, SBN 344466
zfreund@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7000
Facsimile: 213.229.7520

CONNOR S. SULLIVAN (pro hac vice forthcoming)
cssullivan@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000

*Attorneys for Defendants NETFLIX WORLDWIDE ENTERTAINMENT, LLC, NETFLIX MUSIC, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, MOR LOUSHY, and DANIEL SIVAN*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TYRA BANKS, an individual,

Plaintiff,

v.

NETFLIX WORLDWIDE ENTERTAINMENT, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, NETFLIX MUSIC, LLC, MOR LOUSHY, an individual, and DANIEL SIVAN, an individual,

Defendants.

CASE NO. 2:26-cv-06467-AB-DMK

**DEFENDANTS' SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS**

Date: October 30, 2026.
Time: 10:00 a.m.
Place: Courtroom 7B

Judge: Hon. André Birotte Jr.
Case Filed: June 13, 2026
Trial Date: Not Set

**NOTICE OF MOTION**

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on Friday, October 30, 2026 at 10:00 a.m. in the United States District Court for the Central District of California, Felicitas and Gonzalo Mendez United States Courthouse, 7th Floor, 350 West 1st Street, Los Angeles, CA 90012, Courtroom 7B, before the Honorable André Birotte Jr., the undersigned Defendants will, and hereby do, move the Court for an order striking and dismissing with prejudice the First, Second, Third, and Fourth Claims for Relief of Plaintiff Tyra Banks's Complaint, pursuant to California Code of Civil Procedure section 425.16 and Federal Rule of Civil Procedure 12(b)(6), dismissing with prejudice the Fifth Claim for Relief of Plaintiff Tyra Banks's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), and awarding Defendants their attorneys' fees and costs.

This Motion is based on this Notice of Motion and Motion; the concurrently filed Memorandum of Points and Authorities; the concurrently filed Declaration of Jay P. Srinivasan and the exhibits attached thereto and lodged with the Court concurrently with this Motion; the complete case file; arguments of counsel; and such other matters as the Court may consider.

This Motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on August 11, 2026 via videoconference.

Dated: August 14, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jay P. Srinivasan*
JAY P. SRINIVASAN

Attorneys for Defendants *NETFLIX WORLDWIDE ENTERTAINMENT, LLC, NETFLIX MUSIC, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, MOR LOUSHY, and DANIEL SIVAN*

## TABLE OF CONTENTS


Page

I. INTRODUCTION ..... 7
II. FACTUAL BACKGROUND ..... 8
A. Tyra Banks and *ANTM* ..... 8
B. The Documentary ..... 9
C. The Soundtrack Album ..... 11
III. LEGAL STANDARD ..... 11
IV. ARGUMENT ..... 11
A. The Court Should Strike Banks's State Law Claims. ..... 11
1. Banks's State Law Claims Arise from Protected Activity. ..... 11
2. Banks's State Law Claims Fail. ..... 12
a. Banks's Defamation by Implication Claims Fail on the Merits. ..... 13
b. Banks Cannot Establish a Claim for False Light. ..... 20
c. Banks's Breach of Contract Claim Fails. ..... 21
B. The Court Should Dismiss All Claims for Failure to State a Claim. ..... 23
1. The Court Should Dismiss Banks's Lanham Act Claim. ..... 23
a. The Claim Fails Under *Rogers v. Grimaldi*. ..... 23
b. The Use of Banks's Image Is Protected. ..... 25
c. The Contract Is Irrelevant. ..... 26
2. The Court Should Dismiss Any Remaining State Law Claims. ..... 26
V. CONCLUSION ..... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ava v. NYP Holdings, Inc.*,
885 N.Y.S.2d 247 (App. Div. 2009) ..... 17

*Biro v. Conde Nast*,
883 F. Supp. 2d 441 (S.D.N.Y. 2012) ..... 20

*Cairns v. Franklin Mint Co.*,
292 F.3d 1139 (9th Cir. 2002) ..... 25

*Carafano v. Metrosplash.com Inc.*,
207 F. Supp. 2d 1055 (C.D. Cal. 2002) ..... 14

*CoreCivic, Inc. v. Candide Grp., LLC*,
46 F.4th 1136 (9th Cir. 2022) ..... 17

*Crowe v. County of San Diego*,
608 F.3d 406 (9th Cir. 2010) ..... 15

*De Havilland v. FX Networks, LLC*,
230 Cal. Rptr. 3d 625 (Ct. App. 2018) ..... 14, 16, 18

*Dillon v. City of New York*,
704 N.Y.S.2d 1 (App. Div. 1999) ..... 15

*Dodds v. Am. Broad. Co.*,
145 F.3d 1053 (9th Cir. 1998) ..... 13, 14, 19

*Doe v. Gangland Prods., Inc.*,
730 F.3d 946 (9th Cir. 2013) ..... 11, 12

*E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*,
547 F.3d 1095 (9th Cir. 2008) ..... 24

*Greenfield v. Philles Records*,
780 N.E.2d 166 (N.Y. 2002) ..... 21, 23

*Haas Automation, Inc. v. Steiner*,
750 F. Supp. 3d 1107 (C.D. Cal. 2024) ..... 11, 25

*Hara v. Netflix, Inc.*,
146 F.4th 872 (9th Cir. 2025) ..... 23, 24

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022) .................................................................... 15

*Hilton v. Hallmark Cards*,
599 F.3d 894 (9th Cir. 2010) ............................................................................... 12

*Hoffman v. Capital Cities/ABC, Inc.*,
255 F.3d 1180 (9th Cir. 2001) ..................................................................... 13, 16, 19

*Hoffman v. West*,
2024 WL 6473635 (C.D. Cal. Dec. 12, 2024)........................................................ 21

*Hope v. Hadley-Luzerne Public Library*,
94 N.Y.S.3d 723 (App. Div. 2019)......................................................................... 18

*Immuno AG v. Moor-Jankowski*,
567 N.E.2d 1270 (N.Y. 1991) ............................................................................... 18

*Issa v. Applegate*,
242 Cal. Rptr. 3d 809 (Ct. App. 2019) .................................................................. 13

*James v. Gannett Co.*,
353 N.E.2d 834 (N.Y. 1976) ........................................................................... 16, 19

*Karaduman v. Newsday, Inc.*,
416 N.E.2d 557 (N.Y. 1980) ................................................................................. 20

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) ................................................................................. 9

*Lichfield v. Kubler*,
--- F.4th ---, 2026 WL 2146985 (10th Cir. July 27, 2026)...................................... 18

*Lively v. Wayfarer Studios LLC*,
786 F. Supp. 3d 695 (S.D.N.Y. 2025) .................................................................... 20

*Maloney v. T3Media, Inc.*,
94 F. Supp. 3d 1128 (C.D. Cal. 2015)............................................................... 11, 12

*Masimore v. Srivastava*,
2026 WL 1020801 (C.D. Cal. Mar. 10, 2026) ........................................................ 20

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991)................................................................................................ 18

*N.Y. Times Co. v. Sullivan*,
376 U.S. 254 (1964) ... 20

*Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*,
392 F.3d 520 (2d Cir. 2004) ... 22

*Navellier v. Sletten*,
52 P.3d 703 (Cal. 2002) ... 12

*Nedlloyd Lines B.V. v. Super. Ct.*,
834 P.2d 1148 (Cal. 1992) ... 13, 20

*New Kids on the Block v. News America Pub., Inc.*,
971 F.2d 302 (9th Cir. 1992) ... 25, 26

*Newton v. Nat'l Broadcasting Co.*,
930 F.2d 662 (9th Cir. 1990) ... 19

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) ... 15

*Pasadena Tournament of Roses Assoc. v. City of Pasadena*,
2021 WL 3553499 (C.D. Cal. July 12, 2021) ... 25

*Pasadena Tournament of Roses Assoc. v. City of Pasadena*,
2022 WL 2189523 (C.D. Cal. Mar. 17, 2022) ... 11, 12

*Price v. Stossel*,
620 F.3d 992 (9th Cir. 2010) ... 13, 15, 16, 18

*Punchbowl, Inc. v. AJ Press, LLC*,
90 F.4th 1022 (9th Cir. 2024) ... 24

*R & R Surgical Inst. v. Int'l Longshore and Warehouse Union*,
2022 WL 1514653 (C.D. Cal. Jan. 5, 2022) ... 20

*Reader's Digest Ass'n v. Superior Court*,
690 P.2d 610 (Cal. 1984) ... 19

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) ... 22

*Sarver v. Chartier*,
813 F.3d 891 (9th Cir. 2016) ... 12

*Stepanov v. Dow Jones & Co., Inc.*,
987 N.Y.S.2d 37 (App. Div. 2014)....13, 14, 15, 16, 19

*Thomas v. Los Angeles Times Commc'ns, LLC*,
189 F. Supp. 2d 1005 (C.D. Cal. 2002), *aff'd*, 45 F. App'x 801 (9th Cir. 2002)....15, 19, 20

*Toyota Motor Sales, U.S.A., Inc. v. Tabari*,
610 F.3d 1171 (9th Cir. 2010)....25

*Troy Group, Inc. v. Tilson*,
364 F. Supp. 2d 1149 (C.D. Cal. 2005)....19

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
875 F.3d 1192 (9th Cir. 2017)....23, 24

*Urbano v. Timberlake*,
2024 WL 460282 (C.D. Cal. Jan. 31, 2024)....12

*Vermont Teddy Bear Co. v. 538 Madison Realty Co.*,
807 N.E.2d 876 (N.Y. 2004)....21

*Wireless Warehouse, Inc. v. Boost Mobile, LLC*,
479 F. App'x 58 (9th Cir. 2012)....13

*Woulfe v. Universal City Studios LLC*,
2022 WL 18216089 (C.D. Cal. Dec. 20, 2022)....12

**Statutes**

Cal. Code Civ. Proc. § 425.16....11

Cal. Code Civ. Proc. § 425.17....12

# I. INTRODUCTION

Tyra Banks sat for a three-and-a-half-hour interview for a documentary about *America's Next Top Model* ("*ANTM*"). After the interview, she signed an agreement granting the filmmakers the right to edit her interview footage, acknowledging she had "no right to review or approve" the finished documentary, and releasing claims arising from it—including for defamation and false light. She now alleges the documentary, *Reality Check: Inside America's Next Top Model* (the "Documentary"), defames her—not because it says anything false about her, but because she wanted advance notice of what another interviewee would say, more of her interview included, and her perspective presented differently.

These are complaints about ordinary editorial decisions. Documentary filmmakers decide whom to interview, what to ask, which answers to include, how to sequence competing accounts, and what to leave on the cutting-room floor. Banks expressly agreed those decisions belonged to the filmmakers. Dissatisfaction with editorial judgments is not actionable defamation.

Banks alleges the Documentary falsely implies she knew contestant Shandi Sullivan was being sexually assaulted during *ANTM*'s filming, failed to intervene, helped conceal it, and later forgot about it—and she claims she was blindsided by Sullivan's statements that she was blackout drunk during that encounter. But Banks cannot plausibly have been surprised that Sullivan was extremely drunk. The underlying *ANTM* episode itself makes this clear. And the Documentary never suggests Banks was on set or in a position to intervene, covered it up, or later forgot about it. It attributes the decision to scale back the original *ANTM* footage to executive producer Ken Mok and broadcast standards—not Banks. And when Banks is asked whether she remembers Sullivan's story, the Documentary shows her answer: "I do remember her story." A documentary expressly showing Banks remembering does not imply that she forgot.

Banks understands editorial discretion. She created, hosted, and executive produced 24 seasons of *ANTM*, making the same kinds of editorial decisions she now

attacks—what footage to include, what to omit, and how to present competing narratives. The Documentary simply turned that editorial lens back on *ANTM* and Banks. Her disagreement with the resulting portrayal does not make it defamatory. Strip away the Complaint's rhetoric of "manipulation" and "surgical editing," and Banks's theory reduces to a request for more airtime and an edit more to her liking. Accepting that theory would invite virtually every dissatisfied documentary subject to sue and force discovery into interviews, raw footage, and editorial deliberations merely by alleging that a different edit would have made them look better. Defamation law does not permit that result, and courts do not second-guess editorial judgments merely because an interview subject would have preferred different ones.

Banks's state law claims arise from protected expressive activity, and she cannot show a probability of prevailing. Her tort claims fail because the Documentary does not reasonably convey the defamatory implications she alleges, much less suggest Defendants intended to convey them. Her breach-of-contract claim fails because nothing in the Documentary violates the editing restrictions in the parties' agreement. Her Lanham Act claim independently fails under settled trademark and First Amendment principles. The Documentary, Album cover, parties' agreement, and settled law foreclose Banks's claims as a matter of law. The Court should strike Banks's state law claims, dismiss the Complaint with prejudice, and award Defendants their attorneys' fees and costs.

## II. FACTUAL BACKGROUND

### A. Tyra Banks and *ANTM*

Tyra Banks created, executive produced, and hosted *ANTM*, a reality television series featuring aspiring models. Compl. ¶¶ 20, 29–30, 33. *ANTM* became a cultural phenomenon, attracting millions of viewers over 24 cycles between 2003 and 2018. *Id.* ¶ 31. *ANTM* experienced "renewed interest" during the COVID-19 pandemic, resulting in "public criticism, including about some of the show's and Ms. Banks' creative choices." *Id.* ¶¶ 40, 41, 90. Banks alleges she "took ownership" of those decisions and

acknowledges *ANTM* included "insensitiv[e]…moments," "really off choices," and "mistakes." *Id.* ¶¶ 41–42, 49. Banks admits she "did not always get it right," *id.* ¶ 39, and that there are choices "she would approach differently today," *id.* ¶ 32.

Cycle 2, Episode 10 ("The Girl Who Cheated"), which aired in 2004, depicts Sullivan and the other contestants drinking with men at their Milan apartment and Sullivan kissing and ultimately having sex with one of the men. Compl. ¶¶ 94, 97–98. Sullivan "discloses on camera that the two had intercourse." *Id.* ¶ 98. She is shown "extremely upset and crying" the next day and calling her boyfriend to confess infidelity. *Id.* ¶¶ 99–103. As Banks acknowledges, "[t]oday many criticize ANTM's decision to show these events and Ms. Sullivan's emotional struggle in the aftermath." *Id.* ¶ 95.

## B. The Documentary

On April 18, 2025, Mor Loushy conducted an on-camera interview of Banks. Compl. ¶¶ 24, 65. Banks signed an Acknowledgement & Release, governed by New York law, granting EverWonder "the right to edit" her interview footage and use it in the Documentary and for "in-context publicity and promotion." Dkt. 1-8 at 2–3 ("Agreement"). Banks acknowledged she had "no right to review or approve" her interview or the Documentary. *Id.* She also agreed to "irrevocably release" EverWonder and anyone involved in producing, exhibiting, or distributing the Documentary from "all claims, known or unknown," including for "defamation" and "false light," arising out of the Documentary, her appearance in it, or the uses described in the Agreement. *Id.*

The Documentary's three episodes were released simultaneously on Netflix on February 16, 2026. Compl. ¶¶ 88, 180. Banks alleges that the Documentary includes approximately 16 minutes of her interview, *id.* ¶ 89, which is interspersed with *ANTM* footage and interviews of judges, producers, and contestants, *see generally* Exs. 1–4.[1] The Documentary explores positive and negative aspects of *ANTM*'s legacy and

[1] The Documentary, which Banks describes in her Complaint, is incorporated by reference. *See Knievel v. ESPN*, 393 F.3d 1068, 1076–77 (9th Cir. 2005). The Documentary's three episodes are lodged as Exhibits 1–3 ("Ep.1," "Ep.2," and "Ep.3") to the Srinivasan Declaration, along with a certified transcript. *See* Ex. 4 ("Tr.").

reexamines several controversial storylines—including, as Banks concedes, "legitimate criticisms" of *ANTM* and choices "she wishe[s] she had handled differently." *Id.* ¶ 68. As Banks summarizes in the Documentary's opening, it explores how *ANTM* "went from this thing that everybody loves to…overnight…just a whole different lens. Look how wrong this is," and seeks to "understand where that" criticism "came from." Ep.1 0:04:16; Tr. 6:20–22. Banks *wanted* to "share her perspective" on *ANTM*'s "flaws." *Id.* ¶ 45.

Banks's defamation claims center only on two brief sequences of the Documentary discussing the *ANTM* episode depicting Sullivan's encounter in Milan. Episode 1 ends with Loushy asking Banks whether she "remember[s] the story with Shandi" and Banks beginning to formulate her response, after saying "Shandi, okay." Ep.1 0:57:22; Tr. 56:19–24. Episode 2 resumes with Banks's response: "I do remember her story. It's a little difficult for me to talk about production because that's not my territory." Ep.2 0:02:02; Tr. 58:5–7. These sequences also include excerpts from Sullivan's interview, in which she says she "was hammered," recounts being "in the shower" and "in the bed," and that "[n]o one did anything to stop it. And it all got filmed." Ep.1 0:57:00; Ep.2 0:00:22; Tr. 56:15–57:13. The footage from this 2004 *ANTM* episode shows Sullivan had sex while heavily intoxicated, and Banks admits she was informed of this by the following day.[2] Compl. ¶ 129. Neither Sullivan nor anyone else in the Documentary says in the Documentary that Banks knew Sullivan's condition at the time, and the Documentary does not accuse Banks of wrongdoing or suggest Banks was present during the encounter or in a position to intervene. *See generally* Ep.1; Ep.2. The Documentary also does not suggest, one way or another, what Banks knew about Sullivan's experience when she sat for the interview with Loushy in 2025. *Id.*

---

[2] When asked about this episode a few years ago, Banks did not dispute Sullivan's account that she was "way too drunk to even know what's going on," stating only that she "played no role in th[ose]" events. Joey Nolfi, "14 *America's Next Top Model* stars speak on 20 shocking moments…" *Entertainment Weekly* (May 20, 2023), https://ew.com/tv/americas-next-top-model-stars-speak-on-shocking-moments/.

**C. The Soundtrack Album**

Netflix Music released a 26-track soundtrack album (the "Album") titled "Reality Check: Inside America's Next Top Model (Soundtrack from the Netflix Documentary Series)." Compl. ¶¶ 17, 186. The Album cover includes an image of Banks from her interview, alongside photos of three other interviewees, the Album's name, the Netflix logo, and the names of the soundtrack's composers. *Id.*

## III. LEGAL STANDARD

"California law allows for pre-trial dismissal of SLAPPs" under a "two-step approach." *Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1132–33 (C.D. Cal. 2015). "First, the court determines whether the defendant has" proved "that the challenged cause of action arises from protected activity." *Id.* If so, the plaintiff must show "a probability that [she] will prevail on the claim[s]." Cal. Code Civ. Proc. § 425.16(b)(1). "Where a defendant moves to strike a claim on anti-SLAPP grounds and argues that the claim in question lacks legal sufficiency, the standards of Rule 12(b)(6) govern." *Pasadena Tournament of Roses Assoc. v. City of Pasadena*, 2022 WL 2189523, at *2 (C.D. Cal. Mar. 17, 2022). To survive Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Haas Automation, Inc. v. Steiner*, 750 F. Supp. 3d 1107, 1113–14 (C.D. Cal. 2024).

## IV. ARGUMENT

**A. The Court Should Strike Banks's State Law Claims.**

Banks's first four causes of action—two for defamation by implication, one for false light, and one for breach of contract—should be struck under California's anti-SLAPP statute and dismissed with prejudice.

**1. Banks's State Law Claims Arise from Protected Activity.**

Defendants have shown they "engaged in conduct (1) in furtherance of the right of free speech, and (2) in connection with an issue of public interest." *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 953 (9th Cir. 2013); Cal. Code Civ. Proc. § 425.16(a), (e)(4).

First, "the creation or production of a documentary film is conduct in furtherance of speech." *Urbano v. Timberlake*, 2024 WL 460282, at *4 (C.D. Cal. Jan. 31, 2024); *see also Doe*, 730 F.3d at 953. Banks's defamation and false light claims arise from the Documentary's creation and editing. Her breach of contract claim arises from that same activity, and from promoting the Documentary by designing the Album's cover. The "activit[ies] that give[] rise to [Defendant's] asserted liability"—filmmaking, design, and promotion—are expressive conduct. *Navellier v. Sletten*, 52 P.3d 703, 711 (Cal. 2002).

Second, that conduct was undertaken in connection with an issue of public interest—creation of a widely viewed Documentary examining a popular, culturally significant television series. Courts construe this factor "broadly," encompassing speech concerning "a person or entity in the public eye" and works that attracted widespread attention, like *ANTM* and Banks. *Hilton v. Hallmark Cards*, 599 F.3d 894, 906–907 (9th Cir. 2010); *see Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016); Compl. ¶ 179. The Documentary also examined and "contribute[d] to the public debate" about *ANTM* and its legacy. *Woulfe v. Universal City Studios LLC*, 2022 WL 18216089, at *5 (C.D. Cal. Dec. 20, 2022). And the design of the Album cover likewise was "in connection" with an issue of public interest—it promoted the Documentary and featured Banks, a celebrity, as one of the Documentary's subjects. *See* Cal. Code Civ. Proc. § 425.17(d)(2).

**2. Banks's State Law Claims Fail.**

The burden shifts to Banks to show "a probability [she] will prevail." *Maloney*, 94 F. Supp. 3d at 1132. Where, as here, Defendants challenge the legal sufficiency of the claims, courts apply "the standards of Rule 12(b)(6)." *Pasadena*, 2022 WL 2189523, at *2. Because Banks cannot show her claims are "plausible on [their] face," they cannot survive this motion. *Id*.

**a. Banks's Defamation by Implication Claims Fail on the Merits.**[3]

Banks brings two claims for defamation by implication, despite expressly identifying "defamation" among the claims she released in the Agreement. Agreement at 2. Her claims independently fail on the merits.

Because Banks alleges defamation only *by implication*, she must show that the Documentary itself, viewed as a whole by a reasonable viewer, actually communicates the defamatory implications she alleges. *See Stepanov v. Dow Jones & Co., Inc.*, 987 N.Y.S.2d 37, 44 (App. Div. 2014) (defamation-by-implication plaintiffs must show "the language of the communication as a whole can be reasonably read…to impart a defamatory inference"); *Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010) ("published statement must reasonably be understood as implying the alleged defamatory content"). A "plaintiff may not construct an actionable statement by reading whatever implication [she] wishes into the defendants' words." *Issa v. Applegate*, 242 Cal. Rptr. 3d 809, 824 (Ct. App. 2019). Banks must also show that the implication she alleges was *intended*, not inadvertent. That is true under New York law. *See Stepanov*, 987 N.Y.S.2d at 44 ("language of the communication as a whole can be reasonably read…to affirmatively suggest that the author intended or endorsed [the] inference"). It is also true in California for plaintiffs who, like Banks, are public figures. *See Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1187 (9th Cir. 2001) (public figures like Banks must show intent to convey implication); *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998)

[3] Banks's tort claims, which focus on how her interview was edited and presented in the Documentary, are governed by New York law because they arise from and relate to the Agreement. *See Nedlloyd Lines B.V. v. Super. Ct.*, 834 P.2d 1148, 1153 (Cal. 1992) (under California choice-of-law principles, contractual "choice-of-law clause" "appl[ies] to all causes of action arising from or related to [parties'] contract"); *Wireless Warehouse, Inc. v. Boost Mobile, LLC*, 479 F. App'x 58, 58–59 (9th Cir. 2012) (applying Virginia law to "contract and tort claims" where parties' contract included Virginia choice-of-law provision). Regardless, Banks's claims fail whether the Court applies New York or California law. Defendants identify throughout the principles that bar Banks's claims under the law of both jurisdictions.

(same).[4]

Viewed as a whole, as the law requires, the Documentary does not reasonably communicate *any* of the implications Banks alleges. And in light of the Documentary's content, Banks fails to plausibly allege, as she must, that any Defendant *intended* to convey the implications she invents. Banks cannot make the requisite "rigorous showing" as to either defamation claim.

**Second Claim.** Banks alleges the Documentary falsely implies she knew Sullivan "was sexually assaulted during the filming of ANTM and had forgotten about it entirely." Compl. ¶ 205. No reasonable viewer could draw either inference. The Documentary expressly shows Banks *remembered* Sullivan's experience in Milan. And nothing in the Documentary suggests Banks knew or believed, while Sullivan's encounter was occurring, that Sullivan was being "sexually assaulted"—much less that any Defendant "intended" either implication. *Stepanov*, 987 N.Y.S.2d at 44; *Dodds*, 145 F.3d at 1064; *De Havilland v. FX Networks, LLC*, 230 Cal. Rptr. 3d 625, 646 (Ct. App. 2018).

The Documentary cannot reasonably be understood to imply Banks forgot Sullivan's experience because it expressly shows otherwise. At the end of Episode 1, a producer says, "A more difficult territory is Shandi"; Banks responds, "Shandi, okay." When asked, "You remember the story with Shandi?," Banks replies, "Um…" before the episode ends. Ep.1 0:57:22; Tr. 56:19–24. Even that sequence does not suggest Banks forgot Sullivan: Banks immediately recognizes her—"Shandi, okay"—and begins to respond.

And the Documentary expressly confirms that Banks remembered Sullivan and her experience. Just two minutes into Episode 2—which was released simultaneously

[4] Though likely an all-purpose public figure, Banks, at a minimum, is a limited-purpose public figure with respect to *ANTM* and her role in it. As she concedes, she is a "world-famous supermodel, television personality, and entrepreneur whose name, image, and likeness are uniquely and unmistakably associated with her in the minds of the consuming public." Compl. ¶ 242; *Carafano v. Metrosplash.com Inc.*, 207 F. Supp. 2d 1055, 1071 (C.D. Cal. 2002).

with Episode 1, *see* Compl. ¶ 88—Banks nods and answers: "I do remember her story." Ep.2 0:02:02; Tr. 58:5–6; *see* Compl. ¶ 130. Defamation claims must be evaluated "in the context of the entire statement or publication as a whole, tested against the understanding of the average [viewer]," *Dillon v. City of New York*, 704 N.Y.S.2d 1, 5 (App. Div. 1999), not through "snippets taken out of context," *Crowe v. County of San Diego*, 608 F.3d 406, 443 (9th Cir. 2010); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995). Viewed as a whole, the Documentary cannot reasonably be read to imply that Banks forgot about Sullivan when it expressly shows Banks saying she remembered her. *Stepanov*, 987 N.Y.S.2d at 45; *Price*, 620 F.3d at 1003. Nor could any Defendant have intended to convey an implication the Documentary itself expressly contradicts; if anything, including Banks's answer "seems calculated to prevent such an inference." *Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 150 (S.D.N.Y. 2022); *see Thomas v. Los Angeles Times Commc'ns, LLC*, 189 F. Supp. 2d 1005, 1013 (C.D. Cal. 2002) (granting anti-SLAPP motion to strike defamation by implication claim where "no reasonable juror could find that Defendants intended to convey" the alleged implication), *aff'd*, 45 F. App'x 801 (9th Cir. 2002).

Nor does the Documentary imply Banks contemporaneously knew Sullivan was incapable of consenting or was being sexually assaulted. The 2004 *ANTM* episode depicted Sullivan "intoxicated" and having "intercourse with a man in Milan," Compl. ¶ 8, and Banks alleges she was likely informed about Sullivan's "sexual encounter" by the following day, *id.* ¶ 129. Neither fact establishes the implication Banks alleges: that the Documentary portrays her as knowing Sullivan was unable to consent or was being sexually assaulted.

The Documentary attributes no such knowledge to Banks. Although Sullivan recounts that she was "blacked out" and "passed out" during the encounter, Ep.2 0:00:38; Tr. 57:11–13, neither Sullivan nor anyone else says Banks knew that at the time. *ANTM* creative director Jay Manuel recalls only that, while the episode was filming, "we got word Shandi's having sex in the shower with a guy." Ep.2 0:02:43; Tr.

58:19–22. Neither Manuel nor anyone else identifies Banks as someone who "got word." And even if a viewer somehow inferred she did, Manuel says only that some people learned Sullivan was "having sex"—not that she was blacked out, incapable of consenting, or being sexually assaulted. Indeed, no one in the Documentary, including Sullivan, uses the term "assault" to describe the encounter.

The Documentary's portrayal of Sullivan as being very drunk that night is also consistent with what the 2004 *ANTM* episode itself showed onscreen, as well as with Banks's own public understanding. When *Entertainment Weekly* reported in 2023 that Sullivan said she was "way too drunk to even know what's going on" and later "passed out," Banks responded through a spokesperson that she "played no role in the events that occurred this night" and that "[e]veryone, including production, was surprised to find out what had transpired." Nolfi, *supra* n.2. The Documentary suggests nothing different. It does not attribute to Banks real-time knowledge of Sullivan's experience or suggest that Banks participated in the events.

The Documentary therefore is "not susceptible to [the] defamatory construction" Banks alleges, *James v. Gannett Co.*, 353 N.E.2d 834, 838 (N.Y. 1976), and cannot "reasonably be understood as implying" that alleged implication, *Price*, 620 F.3d at 1003. Nothing in the Documentary reasonably implies Banks contemporaneously knew Sullivan was being sexually assaulted, and nothing affirmatively suggests any Defendant "intended or endorsed" that implication. *Stepanov*, 987 N.Y.S.2d at 44; *Hoffman*, 255 F.3d at 1188.

**<u>Third Claim.</u>** Banks also alleges the Documentary implies she "had contemporaneous knowledge that Ms. Sullivan was being sexually assaulted," but "failed to take any steps to intervene or stop the assault," "subsequently concealed the assault by controlling editing of the footage," and manipulated Sullivan into confessing infidelity. Compl. ¶ 221. The Documentary cannot be reasonably interpreted as implying any of these things, and Banks cannot show any Defendant intended or endorsed any such inference. *See Stepanov*, 987 N.Y.S.2d at 44; *Price*, 620 F.3d at

1003; *De Havilland*, 230 Cal. Rptr. 3d at 646.

The Documentary does not even imply Banks knew about Sullivan's encounter at the time, much less that Banks knew or believed a sexual assault was occurring. The Documentary also does not imply Banks was on set or in a position to "intervene" during Sullivan's encounter. In fact, it shows Banks explaining she was *not* responsible for on-set "production" decisions like what footage to film; instead, she points to Ken Mok, *ANTM*'s co-executive producer whom Banks calls the "head of story." Ep.2 0:07:56; Tr. 62:22–23. The Documentary *reinforces* that distinction: it shows a filmmaker asking *Ken Mok* whether there was "ever a sense" that producers "need[ed] to turn the cameras off?" Ep.2 0:02:09; Tr. 58:8–9. The Documentary never poses a similar question to Banks.[5] In short, the "context" for this alleged implication establishes "as a matter of law" that it is "not reasonably susceptible of [the] defamatory connotation" that Banks claims. *Ava v. NYP Holdings, Inc.*, 885 N.Y.S.2d 247, 64 A.D.3d 407, 413 (App. Div. 2009); *see also CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1145 (9th Cir. 2022) (plaintiffs cannot create defamatory implication by interpreting statement "in a manner contrary to [its] clear context").

The Documentary also does not imply Banks "orchestrat[ed] a sexual assault cover up" by "controlling the editing of the footage." Compl. ¶¶ 168, 197. It clearly signals the encounter was edited to make the scene *less graphic*, not to conceal an assault. It shows Mok stating that when he "saw the footage, we scaled back that scene in a significant way," Ep.2 0:07:46; Tr. 62:19–21, and Manuel stating that producers had to "re-edit that scene" after the 2004 Super Bowl Halftime Show controversy led to stricter regulations on "what you could show," Ep.2 0:08:05; Tr. 63:1–5. Banks's comment—that "we didn't put everything on TV"—merely echoes what her colleagues said. Ep.2 0:08:37; Tr. 62:23–25. In this context, no reasonable viewer would

[5] This also undermines Banks's assertion that the Documentary implies she is "lying" when it shows her *accurate* title ("Executive Producer") while she says "production" was "not [her] territory." Compl. ¶¶ 130–31. The Documentary, which repeatedly includes that "Executive Producer" caption, and similar ones for other interviewees, takes at face value Banks's assertion that this was Mok's "territory," not hers.

understand a discussion of reducing explicit footage for broadcast standards as an accusation that Banks participated in concealing a sexual assault. And given all of this, Banks cannot show, and does not plausibly allege, that any Defendant *intended* the implications that she declined to intervene in or "covered up" a "sexual assault." *See De Havilland*, 230 Cal. Rptr. 3d at 646. The Documentary says nothing to imply that—and contradicts those implications in multiple ways. "Any reasonable viewer would understand that if [the Documentary] had meant to accuse [Banks] of involvement in a" cover-up, or of turning her back on an assault, it "would say more and say it explicitly at some point in the series." *Lichfield v. Kubler*, --- F.4th ---, 2026 WL 2146985, at *8 (10th Cir. July 27, 2026).

Finally, no reasonable viewer could interpret the Documentary as implying Banks "initiated a conversation about cheating to manipulate Ms. Sullivan into a confession," Compl. ¶ 221. Sullivan had already disclosed the infidelity: the same *ANTM* episode showed her kissing a man, stating they "had intercourse," and calling her boyfriend to confess. *Id.* ¶¶ 96–100. And the Documentary accurately shows Banks asking Sullivan, "You cheated on him?" and eliciting Sullivan's affirmative nod. Ep.2 0:04:38; Tr. 60:12. That "substantially true" depiction is nonactionable, *Hope v. Hadley-Luzerne Public Library*, 94 N.Y.S.3d 723, 725 (App. Div. 2019); *Price*, 620 F.3d at 1000, even if it contains "minor inaccuracies," *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–17 (1991).

Banks also relies on journalist Zakiya Gibbons's nonactionable opinion. The Documentary makes clear Gibbons lacks first-hand knowledge—she says she was "about 12" when the episode aired—and presents her opinion that Banks's "girl's talk" was influenced by "producers" in her "ear" to start "talking about cheating." Compl. ¶¶ 121, 122, 127; Ep.2 0:03:17; Tr. 59:10–11. Viewed in context, "a reasonable person" would interpret that kind of "loose, figurative…language" as nonactionable statements of opinion, not "expressing or implying any facts." *Immuno AG v. Moor-Jankowski*,

567 N.E.2d 1270, 1281 (N.Y. 1991); *see also Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149, 1157 (C.D. Cal. 2005).

More generally, the full Documentary categorically contradicts the idea that any Defendant "intended or endorsed [the] defamatory inference[s]" Banks alleges in her third claim for relief. *Stepanov*, 987 N.Y.S.2d at 44; *see also Hoffman*, 255 F.3d at 1188 ("there is no clear and convincing evidence in the [publication] itself that [the defendant] intended" the alleged defamatory implication); *Dodds*, 145 F.3d at 1064. The Documentary opens and closes by presenting Banks's perspective on *ANTM*'s legacy. Ep.1 0:03:26–0:04:32; Ep.3 0:49:50–0:50:28; Tr. 5:23–6:24, 142:22–143:9. It charts her backstory as a model struggling against outmoded prejudices in the fashion industry, and emphasizes her successful efforts to transform beauty standards and expand opportunities for diverse backgrounds. *See, e.g.,* Ep.1 0:00:52, 0:28:50; Ep.2 0:20:38, 0:36:54; Ep.3 0:48:47; Tr. 2:24–3:2, 31:3–21, 91:6–11, 120:14–22, 141:21–24. It is not plausible that any Defendant—despite including extensive footage praising Banks and her positive impacts in the Documentary—intended to disparage Banks. *See Thomas*, 189 F. Supp. 2d at 1013 ("No reasonable juror could find that Defendants intended to convey" the alleged implication).

Nor do any of the editorial techniques that Banks labels "editorial manipulation" plausibly indicate that any Defendant acted with defamatory intent. Compl. ¶ 227. Banks claims the Documentary "reassembled" material from her interview, leaving footage "on the cutting room floor," "stripped" some statements of their full "context," and only included excerpts that fit the "story producers chose to tell." *Id.* ¶¶ 5–7. She also complains that Defendants "withheld" from her what other interviewees, particularly Sullivan, said in *their* interviews, thereby "depriv[ing] Ms. Banks of th[e] opportunity" to comment on their accounts. *Id.* ¶¶ 104–05. But "[o]utsiders have no right to sit in the editor's chair," and media defendants are "under no requirement to accede to the suggestions or demands of those mentioned in [their] reports." *James*, 353 N.E.2d at 840–41. Nor is a defendant required to "present" both "side[s]" of every story.

*Reader's Digest Ass'n v. Superior Court*, 690 P.2d 610, 620 (Cal. 1984). "Courts must be slow to intrude into the area of editorial judgment." *Biro v. Conde Nast*, 883 F. Supp. 2d 441, 465 (S.D.N.Y. 2012); *see also Newton v. Nat'l Broadcasting Co.*, 930 F.2d 662, 686 (9th Cir. 1990) (courts should not "intrud[e] too closely into questions of editorial judgment"). Banks may disagree with certain editorial choices, but she cannot possibly show any defamatory implication was "intended" or "endorsed."[6] And there is nothing defamatory about accurately showing Banks's reactions to questions about Sullivan and Sullivan's time on *ANTM*, regardless of what Sullivan said.

Banks "fails to meet even [her] first burden; the [Documentary] gives rise to [none] of the alleged defamatory implications. Moreover, even if [she] had met that burden, [Banks] does not show that [she] has a probability of establishing that [any defendant] intended such defamatory implications." *Thomas*, 45 F. App'x at 802.

**b. Banks Cannot Establish a Claim for False Light.**

Banks also brings a false-light claim, which the Agreement expressly identifies among the claims she released. Agreement at 2. That claim independently fails under governing law. New York law, which applies here, *see Nedlloyd Lines*, 834 P.2d at 1153, "does not recognize [a] cause[] of action for…false light invasion of privacy." *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695, 734 (S.D.N.Y. 2025).

California law leads to the same result. A false-light claim "coupled" with defamation "stands or falls" with the defamation claim it duplicates. *Masimore v. Srivastava*, 2026 WL 1020801, at *5 (C.D. Cal. Mar. 10, 2026). Because Banks fails to plausibly allege defamation, *see supra*, her false light claim "based on the same statements also fails," *Masimore*, 2026 WL 1020801, at *5. It independently fails because false light protects an "interest in privacy," *R & R Surgical Inst. v. Int'l Longshore and Warehouse Union*, 2022 WL 1514653, at *5 (C.D. Cal. Jan. 5, 2022),

[6] Banks also fails to adequately plead—and cannot show—that Defendants acted with "actual malice." *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 283–84 (1964); *Karaduman v. Newsday, Inc.*, 416 N.E.2d 557, 566 (N.Y. 1980).

while Banks challenges only statements about her "public professional life," not her "private life." *Hoffman v. West*, 2024 WL 6473635, at *8 (C.D. Cal. Dec. 12, 2024).

**c. Banks's Breach of Contract Claim Fails.**

Banks does not plausibly allege EverWonder breached the Agreement by "editing Ms. Banks's Material"—her interview footage—"in a manner that constitutes actionable defamation." Compl. ¶ 239; Agreement at 2; *see supra* § IV.A.2.a. She also fails to plausibly allege any other breach.

***i. EverWonder did not breach the provision that prohibited "overdub[bing]" or "replac[ing]" Banks's "words."***

New York law requires applying the plain language of the contract. *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002). Banks alleges a violation of a term providing that EverWonder could not "overdub or otherwise replace any words actually spoken by" Banks "with other words that materially and objectively alter the meaning," such as "replac[ing] the word 'love' with the word 'hate.'" Agreement at 2. Banks does not allege any overdubbing or substitution of words. She alleges merely "excising…words and gestures," and "replacing the resulting gaps" with "silence" or "cuts to black." Compl. ¶ 239. That is ordinary editing, not a breach.

***ii. Netflix's use of Banks's image on the Album cover does not constitute a breach of contract by EverWonder.***

Banks also has no claim arising from the Album cover. Banks alleges EverWonder licensed the Documentary to Netflix, which provided footage to Netflix Music for the Album cover. Compl. ¶¶ 191–92, 259. Banks sued only EverWonder for breach. Even if, as Banks alleges with no citation or explanation in support, the Agreement's terms flow down a "licensing chain," *id.* ¶ 184, the Agreement does not make EverWonder a guarantor for all conduct down that "chain"—and Banks cannot create a guarantee obligation the Agreement does not impose. *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004). Banks does not allege any affirmative act by *EverWonder* that breached the Agreement—her allegations

merely show that EverWonder "exhibit[ed] and licens[ed] others to exhibit the" Documentary, as the Agreement permits. Agreement at 2.

Regardless, the Agreement authorizes Banks's image from the Documentary on the Album cover by permitting the use of Banks's "likeness" and "image" for "in-context publicity and promotion." Agreement at 2. Using Banks's image did not violate the Agreement's prohibitions on "merchandising or commercial tie-ins" or products "separate or apart from the [Documentary] beyond what is expressly permitted" in the Agreement. *Id*. The Album is not a separate product like a hat or bobblehead or an advertisement for unrelated property. It promotes the Documentary "in-context" with the Documentary's title, subjects, and the subtitle "Soundtrack from the *Netflix Documentary Series*," with Netflix's logo. Compl. ¶ 17. And the Album does not go "beyond what is expressly permitted"; Banks authorized use of her image for "in-context…promotion." Agreement at 2.

Banks also does not plausibly allege contract damages caused by use of her image on the Album cover independent of any alleged reputational harm she attributes to the *Documentary itself*. "Causation is an essential element of damages in a breach of contract action." *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004). Just as she cannot state a claim under the Lanham Act, *see infra* § IV.B.1, Banks cannot establish any breach on the theory that using her image "constitute[d] an endorsement" of the Album. Agreement at 2; Compl. ¶ 185.

No other alleged conduct gives rise to a breach-of-contract claim. For example, Banks complains the Documentary "exceed[ed] [the] overall scope" of the Agreement because the Documentary's original title—denoted in the Agreement as a working title ("w/t")—changed, and its content evolved from pitch materials. Compl. ¶¶ 178–80. But Banks willingly "participated in" the Documentary and was "interviewed…for" it; she cannot claim the Documentary was unauthorized because its working title changed. *Id.* ¶¶ 3, 24. And the Agreement provides it is the "entire agreement" and that Banks was "not relying on any" extrinsic statements, such as pitch materials. Agreement at 3. Nor

can Banks show the Agreement is "ambiguous" because it does not detail the Documentary's content, Compl. ¶ 178; "silence" is not "ambiguity," *Greenfield*, 780 N.E.2d at 173.

**B. The Court Should Dismiss All Claims for Failure to State a Claim.**

**1. The Court Should Dismiss Banks's Lanham Act Claim.**

**a. The Claim Fails Under *Rogers v. Grimaldi*.**

False endorsement claims ordinarily are evaluated under the Lanham Act's likelihood-of-confusion standard. *Hara v. Netflix, Inc.*, 146 F.4th 872, 877 (9th Cir. 2025). But where a challenged use appears in an expressive work and functions "not to designate a work's source, but solely to perform another expressive function," *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989) applies. *Hara*, 146 F.4th at 876. The threshold question is whether the challenged use functions as a mark identifying the source of the defendant's goods. *Id.* at 876–81.

The incorporated Album cover answers that question. Banks alleges her image is "dominant," makes her the Album's "largest figure," and caused her likeness to "function as a source identifier" and "principal endorser." Compl. ¶¶ 189, 262. But the cover identifies the Album as the "Soundtrack from the Netflix Documentary Series," displays Netflix's logo, gives the Documentary's title, and credits "Music by Jasha Klebe, Benny Reiner & Empara Mi." *Id.* ¶¶ 17, 186. It also depicts several subjects of the Documentary, including Banks. *Id.* The cover identifies the Album as a Netflix documentary soundtrack and credits its composers, while Banks's photograph identifies one of the Documentary's principal subjects. The cover does not use her likeness "in a source-identifying manner." *Hara*, 146 F.4th at 879.

Banks cannot avoid *Rogers* by alleging the Album was "separately released, separately marketed, and separately monetized," or by labeling the cover the Album's "principal point-of-sale identifier." Compl. ¶¶ 187–90, 261. Albums are expressive works, and promotional activity auxiliary to those works remains protected even when it generates revenue. *Twentieth Century Fox Television v. Empire Distribution, Inc.*,

875 F.3d 1192, 1195–97 (9th Cir. 2017). Appearing on the cover of a separately sold expressive work does not itself make an image a source identifier; what matters is what the image identifies. Here, Banks's image identifies a principal subject of the Documentary, not the Album's source.

*Hara* confirms the point. There, Netflix allegedly used an animated depiction of the plaintiff in an episode of *Q-Force* and promotional materials. 146 F.4th at 875–76. Although the plaintiff alleged those uses implied endorsement, the Ninth Circuit held that *Rogers* applied because the likeness did not identify the plaintiff as the work's source or origin; it instead performed an expressive function. *Id.* at 879–82. The same is true here. Banks's likeness identifies a subject of the Documentary, not the source of its soundtrack.

Under *Rogers*, a Lanham Act claim challenging an expressive work may proceed only if the challenged use (1) has "no artistic relevance to the underlying work whatsoever" or (2), if it has some artistic relevance, "explicitly misleads as to the source or the content of the work." *Hara*, 146 F.4th at 877, 882–84. Banks satisfies neither.

**Banks's Image Has Artistic Relevance.** The first *Rogers* prong requires only "above zero" artistic relevance. *E.S.S. Ent. 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008). The Album contains music from a Documentary about *ANTM*. Banks created and hosted *ANTM* and is a central subject of the Documentary. Compl. ¶¶ 3, 17. Her image identifies the Documentary's subject matter. *Twentieth Cent. Fox*, 875 F.3d at 1199. The "use of [Banks's] likeness is an artistic choice that supports the…theme" of the Documentary and the Album. *Hara*, 146 F.4th at 883.

**Nothing on the Cover Explicitly Claims Banks's Endorsement.** Under the second *Rogers* prong, Banks must identify an "explicit indication, overt claim, or explicit misstatement about the source of the work." *Punchbowl, Inc. v. AJ Press, LLC*, 90 F.4th 1022, 1028 (9th Cir. 2024) (citation omitted). "[T]he mere use of" Banks's image "alone cannot suffice to make such use explicitly misleading." *E.S.S. Ent.*, 547 F.3d at 1100.

Banks identifies no statement she endorsed, sponsored, authorized, approved, or produced the Album. Compl. ¶¶ 262–67. Instead, she relies on the prominence of her image, its placement on the cover, the Album's separate commercial release, the absence of a disclaimer, and alleged industry expectations. *Id.* ¶¶ 187–90, 261–65. Those allegations assert only an implied association—not the explicit representation *Rogers* requires. In *Haas Automation*, this Court held that photographs on a book cover did not satisfy *Rogers*'s second prong because they contained no "explicit indication, overt claim, or explicit misstatement" of endorsement, even if they arguably implied an association. 750 F. Supp. 3d at 1118–19 (citation omitted). The same is true here.

**b. The Use of Banks's Image Is Protected.**

The nominative fair use doctrine applies "where a defendant uses the mark to refer to" the plaintiff's "trademarked good" or famous persona itself, not as a source of the defendant's goods. *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1175 (9th Cir. 2010); *see, e.g.*, *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 308 (9th Cir. 1992) (survey about New Kids on the Block used its name "to refer to the New Kids themselves"); *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1144, 1152–53 (9th Cir. 2002) ("Princess Diana's name and likeness" on "jewelry, plates, and dolls" used "to describe Princess Diana"). The doctrine asks whether (1) the person cannot readily be identified without using the name or likeness, (2) only so much of the identity is used as reasonably necessary, and (3) the defendant does nothing, in conjunction with the use, to suggest sponsorship or endorsement. *New Kids*, 971 F.2d at 308. Banks "bears the burden" of pleading facts defeating nominative fair use. *Pasadena Tournament of Roses Assoc. v. City of Pasadena*, 2021 WL 3553499, at *5 (C.D. Cal. July 12, 2021). She has not.

First, Banks "is not readily identifiable" as the Documentary's principal subject "without the use of her likeness." *Cairns*, 292 F.3d at 1153.

Second, the Album used "only so much of" Banks's image as "reasonably necessary to identify" her as a "subject of" the Documentary: a single photograph of

Banks without "anything else that [wasn't] needed." *New Kids*, 971 F.2d at 308.

Finally, the Album did "nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by" Banks. *New Kids*, 971 F.2d at 308. Banks relies on the image's size, her prominence and association with *ANTM*, lack of disclaimer, and commercial expectations. Compl. ¶¶ 261–65. None are representations made "in conjunction with" the image to suggest endorsement. *New Kids*, 971 F.2d at 308. In fact, the cover identifies the Album's actual sources, including Netflix and the soundtrack composers, *see* Compl. ¶¶ 17, 186, while using Banks's photograph only to identify her as one of the Documentary's subjects.

**c. The Contract Is Irrelevant.**

Finally, Banks cannot create a Lanham Act claim by alleging the Album cover breached her Agreement. Compl. ¶ 268. Whether the Album cover violated the Agreement is a contract question—and it did not, *supra* § IV.A.2.c.

**2. The Court Should Dismiss Any Remaining State Law Claims.**

Even if the anti-SLAPP statute does not dispose of any of Banks's state law claims, those claims independently fail under Rule 12(b)(6) and should be dismissed, without leave to amend. *See supra* § IV.A.2. The Documentary, Album cover, and Agreement establish that Banks was not defamed or placed in a false light and the Agreement was not breached. No amendment could salvage these claims.

## V. CONCLUSION

The Court should grant the Special Motion to Strike Banks's state law claims and award Defendants their attorneys' fees and costs. The Court should also dismiss all remaining claims with prejudice.

Dated: August 14, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jay P. Srinivasan*
JAY P. SRINIVASAN

Attorneys for Defendants *NETFLIX WORLDWIDE ENTERTAINMENT, LLC, NETFLIX MUSIC, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, MOR LOUSHY, and DANIEL SIVAN*

**Local Rule 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,796 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 14, 2026

GIBSON, DUNN & CRUTCHER LLP

By: */s/ Jay P. Srinivasan*
JAY P. SRINIVASAN

Attorneys for Defendants *NETFLIX WORLDWIDE ENTERTAINMENT, LLC, NETFLIX MUSIC, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, MOR LOUSHY, and DANIEL SIVAN*