Mitchell Langberg (CA Bar No. 171912)
mitch@clarelocke.com
Thomas A. Clare*
tom@clarelocke.com
Megan McGuiggan*
megan.mcguiggan@clarelocke.com
Carolyn M. Wesnousky*
carrie@clarelocke.com
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
**pro hac vice forthcoming*
*Attorneys for Plaintiff Tyra Banks*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TYRA BANKS, an individual,<br><br>Plaintiff,<br><br>v.<br>NETFLIX WORLDWIDE ENTERTAINMENT, LLC, 89 BLOCKS HOLDINGS, LLC d/b/a EVERWONDER STUDIO, NETFLIX MUSIC, LLC, MOR LOUSHY, an individual, and DANIEL SIVAN, an individual,<br><br>Defendants. | Case No. 2:26-CV-06467<br>Assigned to Hon. André Birotte Jr.<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE AND MOTION TO DISMISS**<br><br>Date: October 30, 2026<br>Time: 10:00 a.m.<br>Place: Courtroom 7B |

# TABLE OF CONTENTS


**I. INTRODUCTION ..... 7**

**II. FACTS ..... 9**

A. For Twenty Years, Infidelity Was the Only Account Banks Heard ..... 9

B. Three and a Half Hours of Hiding Information from Banks ..... 9

C. Episode 1 Cut the Nod Out of the Middle of Banks' Answer ..... 10

D. "Creator & Executive Producer" ..... 11

E. The Coffee Conversation, Reversed ..... 11

**III. LEGAL STANDARDS ..... 12**

**IV. ARGUMENT ..... 13**

A. Defendants Did Not Carry Their Burden at Step One ..... 13

B. Banks Plausibly Alleges Both Defamation-by-Implication Claims ..... 14

1. Susceptibility, Juxtaposition, and Altered Quotation ..... 14
2. The Second Claim: Episode 1 ..... 15
3. The Third Claim: Episode 2 ..... 18
4. California Law Governs the Tort Claims ..... 20
5. Intent Is Not Before the Court ..... 21
6. The "Editor's Chair" Cases Answer a Claim Banks Does Not Make ..... 23

C. Banks Plausibly Alleges False Light ..... 23

D. Banks Plausibly Alleges Breach of Contract ..... 24

E. Banks Plausibly Alleges a Lanham Act Claim ..... 25

F. Leave to Amend Should Be Granted as to Any Claim Found Deficient ..... 27

**V. CONCLUSION ..... 27**

# TABLE OF AUTHORITIES

**Cases**

*Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740 (C.D. Cal. 2024)....21

*All One God Faith, Inc. v. Organic & Sustainable Indus. Standards, Inc.*, 183 Cal. App. 4th 1186 (2010)....13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)....13

*Baral v. Schnitt*, 1 Cal. 5th 376 (2016)....13

*Cairns v. Franklin Mint Co.*, 292 F.3d 1139 (9th Cir. 2002)....26, 27

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010)....15, 16

*Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384 (1995)....25

*De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845 (2018)....22

*Dodds v. Am. Broad. Co.*, 145 F.3d 1053 (9th Cir. 1998)....21

*Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001)....26, 27

*Edward v. Ellis*, 72 Cal. App. 5th 780 (2021)....14

*Fellows v. Nat'l Enquirer, Inc.*, 42 Cal. 3d 234 (1986)....23, 24

*FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133 (2019)....13

*Gruen v. Richards*,
2025 WL 1420096 (C.D. Cal. Feb. 19, 2025) .......... 13

*Haas Automation, Inc. v. Steiner*,
750 F. Supp. 3d 1107 (C.D. Cal. 2024) .......... 26

*Hara v. Netflix, Inc.*,
146 F.4th 872 (9th Cir. 2025) .......... 26

*Hoffman v. Cap. Cities/ABC, Inc.*,
255 F.3d 1180 (9th Cir. 2001) .......... 22

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) .......... 26

*James v. Gannett Co.*,
40 N.Y.2d 415 (1976) .......... 23

*JMP Secs. LLP v. Altair Nanotechnologies Inc.*,
880 F. Supp. 2d 1029 (N.D. Cal. 2012) .......... 21

*Kaelin v. Globe Commc'ns Corp.*,
162 F.3d 1036 (9th Cir. 1998) .......... 14, 18

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .......... 19

*Lively v. Wayfarer Studios LLC*,
786 F. Supp. 3d 695 (S.D.N.Y. 2025) .......... 21

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) .......... 15

*McCann v. Foster Wheeler LLC*,
48 Cal. 4th 68 (2010) .......... 21

*McQuirk v. Donnelley*,
189 F.3d 793 (9th Cir. 1999) .......... 23

*Metabolife Int'l, Inc. v. Wornick*,
264 F.3d 832 (9th Cir. 2001) .......... 21

*Narayan v. EGL, Inc.*,
616 F.3d 895 (9th Cir. 2010) .......... 20

*Navellier v. Sletten*,
29 Cal. 4th 82 (2002) .......... 12

*Nedlloyd Lines B.V. v. Superior Court*,
3 Cal. 4th 459 (1992) .......... 21

*New Kids on the Block v. News Am. Publ'g, Inc.*,
971 F.2d 302 (9th Cir. 1992) .......... 26, 27

*Newton v. Nat'l Broad. Co.*,
930 F.2d 662 (9th Cir. 1990) .......... 21, 23

*Partington v. Bugliosi*,
56 F.3d 1147 (9th Cir. 1995) .......... 20

*Patton v. Royal Indus., Inc.*,
263 Cal. App. 2d 760 (1968) .......... 24

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
890 F.3d 828 (9th Cir. 2018) .......... 12

*Price v. Stossel*,
620 F.3d 992 (9th Cir. 2010) .......... 14, 15, 20

*Rogers v. Grimaldi*,
875 F.2d 994 (2d Cir. 1989) .......... 25

*Schneider v. Warner Bros. Discovery, Inc.*,
2026 WL 2664058 (Cal. Ct. App. Sept. 10, 2026) .......... 14, 15, 16, 17

*Stepanov v. Dow Jones & Co.*,
120 A.D.3d 28 (N.Y App. Div. 2014) .......... 21

*Thomas v. Los Angeles Times Commc'ns, LLC*,
189 F. Supp. 2d 1005 (C.D. Cal. 2002) .......... 22

*Trotter v. Nat'l Football League*,
737 F. Supp. 3d 172 (S.D.N.Y. 2024) .......... 21

*Twentieth Century Fox Television v. Empire Distribution, Inc.*,
875 F.3d 1192 (9th Cir. 2017) ........ 26

*Verizon Del., Inc. v. Covad Commc'ns Co.*,
377 F.3d 1081 (9th Cir. 2004) ........ 27

*Wagging Tails Prods., Inc. v. Coakley*,
2023 WL 4316777 (C.D. Cal. Feb. 21, 2023) ........ 20

*Weller v. Am. Broad. Cos.*,
232 Cal. App. 3d 991 (1991) ........ 14, 18, 22

**Other Authorities**

CACI No. 1802 ........ 24

Cal. Civ. Code § 1668 ........ 23

Restatement (Second) of Torts § 652E ........ 24

**Rules**

Fed. R. Civ. P. 12(b)(6) ........ 12

Fed. R. Civ. P. 15(a) ........ 27

Fed. R. Civ. P. Rule 56(d) ........ 22, 27

## I. INTRODUCTION

Tyra Banks' lead claims arise because Defendants used her actual words, but through selective deletion, rearrangement, and other editing techniques, presented them to misrepresent what she said, what she was responding to, and to convey a false and defamatory meaning. Exhibits 1 and 2 illustrate the manipulation in a way that is impossible to fully convey in words.

Ironically, Defendants do the same thing in the opening lines of their motion. There, they tell the Court that Banks released her claims. Dkt. 30 at 7. They again say it to open their defamation argument, *id.* at 13, and again to open their false light argument, *id.* at 20. To make their point, they excise key language from the agreement on which they rely. It releases "all claims, known or unknown (***other than claims arising out of Producer's gross negligence or willful misconduct***), including without limitation … defamation, false light …." Dkt. 1-8 at 2 (emphasis added). When Defendants describe that sentence, they reproduce the words on both sides of the parenthetical but leave the parenthetical out. Dkt. 30 at 9. The words "willful misconduct" appear nowhere in their brief.

Every word Defendants quoted is real. What they removed from between those words changed what the sentence means. The Docuseries[1] works the same way, and willful misconduct is exactly what Banks alleges: that Defendants held the full footage, understood that it contradicted the impressions they were creating, and cut it for the purpose of conveying those false impressions. Compl. ¶¶ 202, 212, 234.

[1] The Complaint refers to the Netflix show as the "Netflix Series"; Defendants' have renamed it the "Documentary." For clarity in this briefing, Banks refers to it by the more accurate "Docuseries."

Exhibits 1 and 2 show how—by comparing what the Docuseries presented against what really happened.[2] In the first, after conveying to viewers Sullivan's story of sexual assault, Banks was asked on camera, "You remember the story with Shandi?" Banks nodded and said, "Um … I do remember her story." Episode 1 airs the question. It airs the "Um." It removes the nod from between them, cuts the answer, and goes to black. Banks is left apparently unable to say whether she remembers the assault of a contestant on her own show. The nod was not cut ***off***. It was cut ***out***. Exhibit 1 shows how that was accomplished.

Exhibit 2 shows a 2004 conversation over coffee. As originally broadcast, Sullivan asks Banks whether she has ever cheated or been cheated on. Banks answers, sees Sullivan tearing up, and asks whether she is okay. The Docuseries deletes Sullivan's question, reverses the order, and adds a commentator to tell viewers that "it is not a coincidence that she starts talking about cheating" and that she has "producers in her ear." *Sullivan* raised the subject. The Docuseries says *Banks* did.

The Court need not take anyone's word for this. Exhibit 1 shows the close of Episode 1 alongside the same exchange in Episode 2, both from the files Defendants lodged. Exhibit 2 places the coffee conversation as the Docuseries presents it alongside the 2004 broadcast, which Defendants partially described to the Court but did not lodge. What Banks cannot show is the rest. She answered questions for three and a half hours, sixteen minutes aired, and Defendants refused to produce the remainder before suit. Compl. ¶¶ 89, 162–66. Where the original recording exists, the Court can see the editing for itself.

Defendants call this "ordinary editorial decisions" and Banks' mere "request for more airtime." Dkt. 30 at 7–8. It is neither. Banks complains only that the

---

[2] Exhibits 1 and 2 are the subject of Plaintiff's Request for Judicial Notice and they are being manually filed with the Court. For the Court's convenience, they are also available at: https://tbanks26-cv-06467.com/.

answers she gave were not the answers that aired. Defendants' motion argued that she "cannot possibly show" intent and "cannot show" actual malice, Dkt. 30 at 20 & n.6. But, when Banks sought discovery, Dkt. 32, Defendants "expressly disclaim[ed] any challenge to the factual sufficiency of Plaintiff's allegations." Dkt. 35 at 19. Held to that disclaimer, Defendants' motion fails: the allegations are true, Banks is entitled to the benefit of all inferences, and the only question is whether the Docuseries is reasonably susceptible of the meanings alleged. It is.

## II. FACTS

### A. For Twenty Years, Infidelity Was the Only Account Banks Heard

Cycle 2, Episode 10 of *America's Next Top Model* ("ANTM") aired in 2004 under the title "The Girl Who Cheated." Compl. ¶ 94. It showed Sullivan drinking with men in Milan, disclosing that she and one of them had intercourse, and calling her boyfriend to confess. *Id.* ¶¶ 97–99. For nearly two decades, "the broad public discussion did not characterize the events other than as infidelity. And that was also Ms. Banks' understanding." *Id.* ¶ 95.

Defendants tell the Court that "Banks admits she was informed" that "Sullivan had sex while heavily intoxicated." Dkt. 30 at 10. The paragraph Defendants cite says something else: Banks was likely told Sullivan "had participated in a sexual encounter"; "she was not aware of the details"; Sullivan herself "only characterized it as a regrettable act of infidelity"; and "nobody told Ms. Banks before or at the time she was interviewed for the Netflix Series" that Sullivan had come to describe the night as an assault. Compl. ¶¶ 129.

### B. Three and a Half Hours of Hiding Information from Banks

Banks sat for an interview with Defendant Loushy in April 2025 and answered questions for roughly 210 minutes. Compl. ¶¶ 24, 65, 89. By then, Sullivan had sat for her own interview and described the Milan encounter as an assault. *Id.* ¶ 142. The producers "chose not to share this with Ms. Banks." *Id.* ¶ 142. Across three and a half hours, "no one from the production team indicated

that Ms. Sullivan had characterized what happened to her in Milan as a sexual assault," and Banks "was not asked a single question that framed the encounter as nonconsensual." *Id.* ¶ 143. Had she been told, Banks "would have addressed it in that context" and "would have stopped the interview." *Id.* ¶ 145.

Months after the interview, Banks and Defendant EverWonder signed the "Acknowledgement & Release" (the "Agreement"). *Id.* ¶ 170; Dkt. 1-8. The Docuseries premiered on February 16, 2026, in three episodes totaling 165 minutes. Compl. ¶ 88. Sixteen minutes of Banks' interview appear in it. *Id.* ¶ 89. The rest has never been provided to her. *Id.* ¶¶ 162–66. The Complaint does not allege that more should have aired. It alleges that "by incorporating so little of it *and manipulating the parts that remained*," the Docuseries "was carefully crafted to convey a series of false narratives." *Id.* ¶ 89 (emphasis added).

**C. Episode 1 Cut the Nod Out of the Middle of Banks' Answer**

Exhibit 1 presents two renderings of a single exchange side by side, at normal speed and in slow motion. Mayo Decl. ¶¶2-10; Ex. 1. In each episode, the exchange follows Sullivan describing a sexual assault—in Episode 1: "… him on top of me. I was blacked out. No one did anything to stop it. And it all got filmed, all of it." Tr. 56. In each, Loushy then asks Banks, "You remember the story with Shandi?" Tr. 56:19–24, 58:5.

In Episode 2, the Court will see Banks nod affirmatively as the question is asked, say "Um," and continue: "I do remember her story …." Tr. 58:5–7; Compl. ¶ 130. In Episode 1, Loushy says, "A more difficult territory is Shandi." Banks answers, nodding, "Shandi, okay." Loushy asks, "You remember the story with Shandi?" The affirmative nod is excised. The "Um" remains. The answer never comes. The screen goes black. The episode is over. Tr. 56:19–24.

Defendants acknowledge the nod; they describe Banks as "nod[ding] and answer[ing]" in Episode 2. Dkt. 30 at 15. They neither address nor deny its removal from Episode 1. The nod occurred between Loushy's question and Banks'

"Um." As the Complaint alleges, and Exhibit 1 shows, it "was carved out of the middle of a continuous sequence, requiring at least two deliberate editorial decisions." Compl. ¶¶ 212.

**D. "Creator & Executive Producer"**

As Exhibit 1 shows, Episode 2 continues Banks' answer: "It's a little difficult for me to talk about production because that's not my territory." Tr. 58:5–7. As she says it, the Docuseries displays Banks' name beside the title "Creator & *Executive* Producer." Compl. ¶¶ 130 (emphasis added). Banks was not on set during the apartment shoot and made no real-time production decisions that night; "production" meant "the day-to-day physical production operations on the ground," not her creative role. *Id.* ¶¶ 198. Defendants call the caption Banks' "*accurate* title." Dkt. 30 at 17 n.5.

In Episode 1's rendering of this exchange, no title appears; in Episode 2, it appears as Banks says production is not her territory. Ex. 1. And just before that, Loushy had asked Sullivan, "Do you think that the production should've stopped it?" Sullivan answered that "they should've … been like, all right, this has gone too far. … we gotta pull her out of this." Tr. 57–58; Compl. ¶ 131. Banks alleges that the sequence was built to convey Banks she knew, failed to intervene, and is now distancing herself. *Id.* ¶¶ 131, 134.

**E. The Coffee Conversation, Reversed**

The Docuseries presents the conversation between Banks and Sullivan the next day. A commentator sets the scene: "The next day, Tyra has a girl's talk, and it is not a coincidence that she starts talking about cheating." Banks is shown describing a boyfriend who cheated on her in Milan. The commentator explains: "Of course, she's gonna have producers in her ear. … [S]he comes in and stokes the fire under the guise of concerned big sis or mentor." Banks is then shown saying: "You okay? You cheated on him? Everybody's messed up Shandi. I'm not judging you …." Tr. 59–60.

Exhibit 2 presents the actual 2004 broadcast beside the Docuseries' version. Mayo Decl. ¶¶2-12. The broadcast reveals the same conversation in the accurate order. Sullivan raised the subject: "I have a personal question … have you ever cheated on anyone? Or had anyone cheat on you?" Compl. ¶¶ 101, 124; Ex. 2. Banks answered the question she was asked: a male model had cheated on her in Milan; it "just hurt me so much." Banks asked whether that answered the question, observed Sullivan tearing up, and asked, "You okay?" Banks' first response to that distress was not an accusation but a guess—"Did your boyfriend cheat on you?" Only when the guess proved wrong did Banks ask, "You cheated on him?" Ex. 2.

These are not differences of emphasis. The Docuseries removed Sullivan's question and put in its place the commentator's assertion that Banks "starts talking about cheating." It removed "I've never cheated on a boyfriend," the clause that made the rest of the answer responsive rather than instigating. It removed "does that answer your question" and the observation that Sullivan was tearing up, which is what made "You okay?" a reply to a crying woman rather than the opening of an interrogation. It removed "Did your boyfriend cheat on you?" altogether. And it set "You okay?" directly against "You cheated on him?" Defendants say the Docuseries "accurately shows Banks asking Sullivan, 'You cheated on him?'" Dkt. 30 at 18. It does; no line was fabricated. But the order was reversed and the question Banks was answering was cut out—Defendants "had the original footage and knew the truth." Compl. ¶¶ 100–03, 121–27.

## III. LEGAL STANDARDS

An anti-SLAPP movant must first show that the challenged claim arises from protected activity; only then does the burden shift to the plaintiff to show "minimal merit." *Navellier v. Sletten*, 29 Cal. 4th 82, 88–89 (2002). In federal court, a motion challenging only legal sufficiency is decided under Rule 12(b)(6). *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). Under Rule 12(b)(6), well-pleaded allegations are accepted as true and

reasonable inferences drawn for the plaintiff. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. ARGUMENT

### A. Defendants Did Not Carry Their Burden at Step One

Defendants invoke a single category of protected activity: section 425.16(e)(4). Dkt. 30 at 11. For that "catchall," courts "engage in a relatively careful analysis." *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 145 (2019). The analysis has two parts: what public issue the conduct implicates, and "what functional relationship exists between the speech and the public conversation about some matter of public interest." *Id.* at 149–50. It is "not enough that the statement refers to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate." *Id.* at 150 (quotation omitted). And speech whose purpose "is to promote the sale of the product to which it is affixed" contributes to no debate. *Id.* at 145 (quoting *All One God Faith, Inc. v. Organic & Sustainable Indus. Standards, Inc.*, 183 Cal. App. 4th 1186, 1204 (2010)).

Defendants never cite *FilmOn*. Their showing on its second part is one sentence asserting that the Docuseries "contribute[d] to the public debate" and, for the album cover, a citation to section 425.17(d)(2), Dkt. 30 at 12, which only lifts the commercial-speech exemption. Defendants identify no functional relationship between the conduct challenged—cutting a nod, reversing a conversation, placing Banks' face on an album cover—and any public conversation. That showing is Defendants' burden, *Baral v. Schnitt*, 1 Cal. 5th 376, 396 (2016), and its omission alone supports denial. *See Gruen v. Richards*, 2025 WL 1420096, at *14 (C.D. Cal. Feb. 19, 2025).

If the Court excuses the omission as to the tort claims, it should not as to the contract claim, least of all the album-cover breach. Compl. ¶¶ 186–93, 235–40. A

soundtrack sold with Banks' portrait on the packaging promotes the product it is affixed to, not any conversation about ANTM.

**B. Banks Plausibly Alleges Both Defamation-by-Implication Claims**

Because they are the focus of Defendants' motion, Banks starts her analysis with her defamation claims—the Second and Third Claims for Relief.

Defendants' answer to the Second Claim rests on one premise: that the close of Episode 1 must be read with the opening of Episode 2, where Banks says "I do remember her story." Dkt. 30 at 14–15. The premise fails three times over. The answer Episode 1 broadcast is a materially altered quotation. Episode 1 is to be analyzed as its audience received it. *Schneider v. Warner Bros. Discovery, Inc.*, 2026 WL 2664058 (Cal. Ct. App. Sept. 10, 2026). And Episode 2 does not cure the implication. The release Defendants invoke, Dkt. 30 at 13, excepts willful misconduct and does not reach these claims. Part IV.C, *infra*.

**1. Susceptibility, Juxtaposition, and Altered Quotation**

Whether a work is reasonably susceptible of a defamatory implication is a question of law; if "susceptible of both an innocent and libelous meaning," "the motion to strike must be denied," and whether it was so understood is for the jury. *Schneider*, 2026 WL 2664058, at *5 (quoting *Edward v. Ellis*, 72 Cal. App. 5th 780, 790 (2021)); *Kaelin v. Globe Commc'ns Corp.*, 162 F.3d 1036, 1040 (9th Cir. 1998). A defendant who "juxtaposes [a] series of facts so as to imply a defamatory connection between them … may be held responsible for the defamatory implication … even though the particular facts are correct." *Schneider*, at *4 (quoting *Weller v. Am. Broad. Cos.*, 232 Cal. App. 3d 991, 1003 n.10 (1991)); *accord Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010). And although a work is ordinarily read as a whole, "when the average audience member ***may*** receive the defamatory elements divorced from the entire work, the analysis must reflect that reality." *Schneider*, at *8 (emphasis added) (citing *Kaelin*, 162 F.3d at 1041).

For a recorded interview, one more rule applies. "[A]n exact quotation out of context can distort meaning, although the speaker did use each reported word." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 515 (1991). The inquiry is "whether the published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity." *Id.* at 521. *Price* applied that rule to video, "compar[ing] the meaning conveyed by the Clip as broadcast with the meaning of [the speaker's] own words in the context [of the statement] actually delivered," and reversed an anti-SLAPP dismissal where an accurate clip was presented "in a misleading context." 620 F.3d at 1002–03.

**2. The Second Claim: Episode 1**

**a. <u>The answer Episode 1 broadcast is not the answer Banks gave</u>**

*Schneider* involved a different kind of claim. The implication there was built from what was said about other people—"voiceovers and graphics … juxtaposed or edited with the visual depictions" of the plaintiff—and he did "not allege that any specific factual statement regarding him … [wa]s false." 2026 WL 2664058, at *1, *4. Here, the Docuseries used Banks' own answer. Asked "You remember the story with Shandi?", Banks nodded and said "I do remember her story." Part II.C, *supra*; Ex. 1. Episode 1 broadcast "Um" and a cut to black. What others (like Sullivan) say around Banks' answer supplies the context for viewer's understanding; the falsity is in the answer itself. Thus, the quotes from Sullivan set the stage by describing an assault. Laushy locks in the context by asking Banks if she remembers Sullivan's "story," and Banks it made to look like she could not remember an assault story. That is a "material change in the meaning conveyed by the statement," *Masson*, 501 U.S. at 517.

Defendants say Banks relies on "snippets taken out of context." Dkt. 30 at 15 (quoting *Crowe v. County of San Diego*, 608 F.3d 406, 443 (9th Cir. 2010)). Banks has not taken a snippet out of context; Defendants removed the exculpatory

frames from inside the clip they aired. And the sentence that follows the one Defendants quote makes Banks' point: a speaker's recorded statements "***must be analyzed in the context of the entire interview, not just the portion the program chose to air.***" *Crowe,* 608 F.3d at 443 (emphasis added). *Crowe* reached its result by comparing the aired portion against the unedited interview. That is the comparison Banks asks the Court to make, and as to Episode 1 she can supply part of it from what Defendants lodged. Ex. 1.

**b. Episode 1 is analyzed as its audience received it**

Defendants say the Docuseries "[v]iewed as a whole" cannot imply that Banks forgot, because Episode 2 "was released simultaneously with Episode 1." Dkt. 30 at 14–15. *Schneider* applied the whole-work rule *and* identified its limit. It analyzed the trailer "in its entirety, but standing apart from the five-part feature it teased," because it was distributed separately and "the purpose of a trailer is to advertise a film and is intended to reach a broader audience than those who will ultimately elect to watch the film in its entirety." 2026 WL 2664058, at *8. That conclusion rested on the manner of publication and the purpose of the device, not a survey of viewers: *Schneider* excludes evidence of what viewers took a work to *mean*, *id.* at *6–7, and relies on facts about what viewers *received*, *id.* at *8.

The Docuseries' form establishes what its audience receives. It is three separately titled episodes, each rolling its own credits. Dkt. 30-2 ("On Top"), 30-3 ("Still in the Running"). And Episode 1 does not simply end. It ends on an unfinished answer and a cut to black. Tr. 56:22–25. That is a cliffhanger, a device whose function is to hold a viewer across a break. It is built for the viewer who stops. Defendants chose to end Episode 1 there, Compl. ¶¶ 206, 212, 213(d), and that choice, like the trailer's purpose in *Schneider*, tells the Court how the work reaches its audience.

Simultaneous release is not simultaneous consumption. Defendants cite to the premiere date, Compl. ¶ 88; nothing before the Court says how, when, or in

what order anyone watched. On 12(b)(6), inferences run to Banks, Dkt. 35 at 19, and the inference that some reasonable viewers stopped, paused, or never continued is the natural consequence of the episodic device Defendants used. To prevail, Defendants need a determination, without evidence, that *no* reasonable viewer stops between episodes. None exists; *Kaelin*, on which *Schneider* relied, rejected the equivalent argument when the "clarification" was inside the same issue of the same magazine. 162 F.3d at 1041.

**c. <u>Standing alone, Episode 1 conveys the implication; Episode 2 compounds it</u>**

"The story with Shandi" takes its meaning from the assault Sullivan has just described. Defendants object that no one in the Docuseries "uses the term 'assault.'" Dkt. 30 at 16. A woman who says she was "blacked out" with a man "on top of" her while "[n]o one did anything to stop it" needs no label. And "it all got filmed, all of it," followed at once by the show's creator—Banks—being asked whether she remembers, supplies the knowledge the Second Claim alleges. Compl. ¶ 205. A reasonable viewer can understand the show's creator, asked whether she remembers it and not answering, as "so indifferent to what had happened to a contestant on ANTM, her own show, that she could not even be bothered to remember it." Compl. ¶¶ 112, 205–06. Defendants' reading—that "Shandi, okay" shows Banks "immediately recognizes her," Dkt. 30 at 14—is one reading. Recognizing a name is not remembering what happened to the person. A work "susceptible of both" meanings clears the 12(b)(6) threshold. *Schneider*, at *5.

*Schneider* reversed because the work itself negated the implication: it attributed the abuse to three named individuals and "affirmatively state[d]" that an investigation into the plaintiff "found no evidence." *Id.* at *14. Nothing in Episode 1 negates anything. The material that would have was inside the sequence Episode 1 aired. Defendants removed it.

Even as one publication, the motion fails. The supposed cure arrives after a second, more graphic account of the assault. Loushy asks Sullivan whether "the production should've stopped it." During Banks' answer, the caption "Creator & Executive Producer" is presented while Banks says production is "not my territory." Tr. 57:5–58:7; Part II.D, *supra*. Any viewer who watches straight through learns that Banks remembers—and in the same answer sees the show's "Creator & Executive Producer" say production is "not my territory." Episode 2 does not replace the false implication that Banks forgot with an innocent one. It replaces it with the implication alleged in the Third Claim: that Banks knew and did nothing.

Defendants concede that *Kaelin* decides whether a false implication is cured by "examining the challenged publication itself—including the placement of the disclaimer relative to the headline." Dkt. 36 at 23. Exhibit 1 is that examination.

**3. The Third Claim: Episode 2**

Episode 2 conveys that Banks knew of the assault and failed to intervene, concealed it, and manipulated Sullivan under the guise of concern. Compl. ¶¶ 221, 227.

**a. <u>Knowledge and failure to intervene</u>**

Sullivan's answer that production "should've … pull[ed] her out of this" is followed immediately by Banks, the show's creator, saying production is "not my territory," under a title identifying her as production. Tr. 57:20–58:7; Part II.D, *supra*. A reasonable viewer can understand that Banks was production, that she knew, and that she is distancing herself. Compl. ¶¶ 131, 227(c). Defendants respond that the Docuseries asks a question of Ken Mok and "never poses a similar question to Banks." Dkt. 30 at 17. But the edit makes Banks answer it; that is what juxtaposition means. *Weller*, 232 Cal. App. 3d at 1003 n.10. That Manuel's "we got word Shandi's having sex in the shower" names no one, Dkt. 30 at 15, is no answer; "we," spoken by the show's creative director about production seconds

after its creator appears on screen, can reasonably be understood to include Banks. Tr. 58:19–22; Compl. ¶ 128. Nothing in the Docuseries says that Banks was not there, did not know, or was not told. Those facts appear in Defendants' brief, Dkt. 30 at 10, 17, not in the work the viewer receives. Nor may Defendants rely on a 2023 *Entertainment Weekly* article, cited by URL, for Banks' "own public understanding." *Id.* at 10 n.2, 16. It is outside the Complaint and cannot be noticed for that inference, *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999–1000 (9th Cir. 2018).

**b. <u>Concealment</u>**

After Sullivan describes being filmed "in a fetal position just crying," Mok says that "when I went into post and saw the footage, we scaled back that scene in a significant way," and Banks, answering a question the Docuseries does not air, says: "I did become a master editor. It's important for people to know that we didn't put everything on TV." Tr. 61:23–62:25; Compl. ¶ 138. Defendants' reading—editing for broadcast standards, Dkt. 30 at 17–18—is plausible. So is the Complaint's: footage of an assault existed, Banks "became a master editor," and "we didn't put everything on TV." Compl. ¶¶ 138–40, 221(d).

**c. <u>Manipulation: the coffee conversation</u>**

The implication of the reversed conversation, Part II.E, *supra*, is that Banks, briefed by producers, raised the subject of infidelity under a pretense of concern to draw a confession from a young woman on camera. Compl. ¶¶ 122–27, 221(b), 227(a). Defendants offer three answers.

First, that Sullivan "had already disclosed the infidelity." Dkt. 30 at 18. The implication is not that Banks uncovered a secret. It is that she drew Sullivan into an "on-air confession" for the show—"exploit[ing] that contestant's trauma for ratings." Compl. ¶¶ 6, 10. Prior disclosure does not answer that implication. If there was nothing left to learn, the only reason to raise the subject, with "producers in her ear," was to get the confession on camera.

Second, that the Docuseries "accurately shows Banks asking Sullivan, 'You cheated on him?'" Dkt. 30 at 18. Under *Price*, the comparison is between the meaning "as published and the meaning of the words as uttered." 620 F.3d at 1003. As uttered, the question was the second of two guesses by Banks who was answering a question and responding to tears—the first, "Did your boyfriend cheat on you?" As published, it opens an interrogation a narrator has just called "not a coincidence." The "minor inaccuracies" that *Masson* tolerates does not extend to reversing who raised the subject here.

Third, that commentator's statement is "nonactionable opinion." Dkt. 30 at 18–19. "[I]t is not a coincidence that she starts talking about cheating" asserts a verifiable, false fact: that Banks started talking about cheating. "[P]roducers in her ear" asserts a fact about what Banks was told. Compl. ¶¶ 122–27. Opinion on stated facts is protected because the audience can judge those facts for itself, *Partington v. Bugliosi*, 56 F.3d 1147, 1156 (9th Cir. 1995)—which presupposes that they are true. Here the stated facts were created by reversing the recording, and Banks sues not the commentator but the producers who resequenced the footage so that her assertion would appear true. Compl. ¶¶ 125–26. The commentary is the Docuseries announcing, in words, the false implication the edit was built to convey.

**4. California Law Governs the Tort Claims**

Defendants argue, in a footnote, that New York law governs because the tort claims "arise from and relate to the Agreement." Dkt. 30 at 13 n.3; *but see* Standing Order ¶ 12(c) ("footnotes must be used sparingly"). This Court applies California's choice-of-law rules, *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010). In California, the scope of a choice-of-law clause is determined under the law of the chosen state. *Wagging Tails Prods., Inc. v. Coakley*, 2023 WL 4316777, at *7 (C.D. Cal. Feb. 21, 2023). New York construes such clauses narrowly: "claims arising from tortious breaches of contractual duties are … not covered by the

contract's choice-of-law clause." *JMP Secs. LLP v. Altair Nanotechnologies Inc.*, 880 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012); *see Trotter v. Nat'l Football League*, 737 F. Supp. 3d 172, 193 (S.D.N.Y. 2024).

That leaves the governmental-interest test. *Acevedo v. eXp Realty, LLC*, 713 F. Supp. 3d 740, 786 (C.D. Cal. 2024). California recognizes false light; New York does not. *Lively v. Wayfarer Studios LLC*, 786 F. Supp. 3d 695 (S.D.N.Y. 2025). For defamation by implication, California asks subjectively whether the defendant "actually intended to convey the defamatory impression," *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1064 (9th Cir. 1998); New York asks objectively whether "the plain language of the communication itself suggests that an inference was intended or endorsed." *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 37–38 (N.Y App. Div. 2014). California's interest predominates: Banks is a California resident injured by California defendants who released the Docuseries from California. Compl. ¶¶ 20–22, 88; *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 97–98 (2010) (a jurisdiction "ordinarily has the predominant interest in regulating conduct that occurs within its borders"). And even a clause that reached these claims would not be enforced where "the law of the chosen state contravenes a fundamental policy" of California. *Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459, 466 (1992). Extinguishing a California resident's false light claim would.

**5. Intent Is Not Before the Court**

Defendants argue that Banks "cannot possibly show any defamatory implication was 'intended' or 'endorsed.'" Dkt. 30 at 20. Under California law, whether the defendant "intended to convey the defamatory impression" is part of the actual-malice inquiry—a "subjective" question, *Dodds*, 145 F.3d at 1063–64; *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 680–81 (9th Cir. 1990), that "cannot be properly disposed of by a motion to dismiss" without discovery. *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 848 & n.18 (9th Cir. 2001). Defendants' own authorities resolved it on developed records: after trial in *Hoffman v. Capital*

*Cities/ABC, Inc.*, 255 F.3d 1180, 1189 (9th Cir. 2001); on summary judgment in *Dodds*; and on the showrunner's sworn declaration in *De Havilland v. FX Networks, LLC*, 21 Cal. App. 5th 845, 869–70 (2018), which called the test "deliberately subjective." None resolved intent on the pleadings.

The closest of Defendants' cases confirms the point. *Thomas v. Los Angeles Times Communications, LLC*, 189 F. Supp. 2d 1005 (C.D. Cal. 2002), struck the claim because the article set out the plaintiff's version beside the others and left "the reader free to draw his own conclusion," and on that basis distinguished *Weller*. *Id.* at 1013–14 & n.5. *Weller* is instructive here. The Docuseries does not set Banks' account beside another and leave the viewer to choose. It removes her account and tells the viewer what to conclude. Nor does it matter that the Docuseries elsewhere presents Banks' perspective and praises her career. Dkt. 30 at 19. A publisher can admire a subject's career and still intend viewers to believe she ignored an assault. Whether flattering footage elsewhere makes that intent implausible is an inference, and Defendants improperly ask the Court to draw it against the pleader.

Defendants have disclaimed any factual challenge and say their actual-malice footnote "is not an independent argument for dismissal." Dkt. 35 at 19; Dkt. 40 at 6. Held to that, the Complaint's allegations of intent, Compl. ¶¶ 200, 212–13, 227, are accepted as true, and they describe a publisher that "deliberately cast [her] statements in an equivocal fashion in the hope of insinuating a defamatory import." *De Havilland*, 21 Cal. App. 5th at 870 (quotation omitted). Not held to it, the motion is what its substance makes it (a Rule 56 motion) and cannot be resolved without the footage, edit lists, and depositions the Rule 56(d) motion requests. Dkt. 32.

**6. The "Editor's Chair" Cases Answer a Claim Banks Does Not Make**

That "[o]utsiders have no right to sit in the editor's chair," Dkt. 30 at 19–20 (quoting *James v. Gannett Co.*, 40 N.Y.2d 415, 423–24 (1976)), answers a claim Banks does not make. She claims no right to approve her portrayal or to control what Defendants included. Banks claims that Defendants cut an affirmative answer out of the middle of footage they possessed, reversed the order of a recorded conversation, and withheld the one fact that would have let her answer the question they made her appear to be answering. Compl. ¶¶ 114–16, 125, 142–45. Defendants' own authorities supply the limiting principle. *Newton* set aside a verdict because the plaintiff's quarrel was with "the precise wording of a sentence [he] concede[d] is true," 930 F.2d at 686; Banks concedes no such thing. And editorial discretion ends at a "statement of material falsehood—implied or otherwise." *Lichfield v. Kubler*, 183 F.4th 1248, 1263 (10th Cir. 2026).

**C. Banks Plausibly Alleges False Light**

Defendants offer four arguments. Dkt. 30 at 20–21. The first—release—fails on the parenthetical Defendants omitted: the Agreement excepts "willful misconduct," Dkt. 1-8 at 2, and Banks alleges that Defendants "had the truth in their possession … and chose fabrication over fact." Compl. ¶ 200. California would not enforce a prospective release of intentional torts in any event. Cal. Civ. Code § 1668; *McQuirk v. Donnelley*, 189 F.3d 793, 798 (9th Cir. 1999) (§ 1668 barred release of defamation claim). The second—that New York does not recognize the tort—fails because California law governs. Part IV.B.4, *supra*. The third—that the claim falls with defamation—fails because the defamation claims stand, and because the torts are distinct and pleaded on different conduct. Compl. ¶¶ 197–99; *Fellows v. Nat'l Enquirer, Inc.*, 42 Cal. 3d 234, 238–39 (1986).

The fourth—that false light requires disclosure of private facts—rests on two unpublished decisions, Dkt. 30 at 20–21, that trace to a 1968 case about a notice

that employees "had been terminated." *Patton v. Royal Indus., Inc.*, 263 Cal. App. 2d 760, 766 (1968). No such element exists. False light "does not depend upon making public any facts concerning the private life of the individual." Restatement (Second) of Torts § 652E cmt. a; *see* CACI No. 1802. Requiring private facts would collapse false light into public disclosure of private facts, a distinct tort that by definition involves true statements. *Fellows*, 42 Cal. 3d at 238–39. And a workplace notice is a far cry from a work portraying Banks as manipulating a victim, lying about her role, and covering up a sexual assault. Compl. ¶ 197.

**D. Banks Plausibly Alleges Breach of Contract**

Banks alleges three independent breaches: EverWonder (1) edited her material "in a manner that constitutes actionable defamation"; (2) excised her "words and gestures" and replaced "the resulting gaps with silence, cuts to black, and fabricated sequences that materially altered the meaning of her statements"; and (3) used her material "in connection with a product—the Music Album—that materially departed from the Programming." Compl. ¶ 239; *see id.* ¶ 237; Dkt. 1-8 at 2. Defendants' answer to the first repeats their defamation argument, Dkt. 30 at 21, and fails with it. Their answer to the second is that "silence" and "cuts to black" are "ordinary editing, not a breach." *Id.* The Complaint alleges more: that Defendants removed Banks' actual answer to convert the fact that she remembered into the appearance that she did not, and that the result "materially and objectively alter[ed] the meaning" of Banks' statements. Compl. ¶¶ 237(b), 239(b). That allegation is accepted on 12(b)(6). Defendants answer that the proviso reaches only substitution of "other words." Dkt. 30 at 21. But it bars Producer from "overdub[bing] *or otherwise replac[ing]*" her words, and its own example says Producer "may not *edit* or replace" them. Dkt. 1-8 at 2 (emphasis added). The "e.g." illustrates; it does not limit. An edit that turns "I do remember her story" into "Um" and silence plausibly falls within it. Nor does this breach depend on the

defamation claims: the second proviso has no defamation element and requires no showing of malice. The breach is the alteration itself.

Defendants' answer to the third is that Netflix, not EverWonder, issued the Album. Dkt. 30 at 21–22. The Agreement defines "Producer" to include its "licensees," Dkt. 1-8 at 2; Compl. ¶ 256, so Netflix's use is Producer's use. And EverWonder could not license what it did not have: the Agreement bars use of the Material "in a manner that constitutes an endorsement by [Banks] of any product, service or entity" without her written consent, Dkt. 1-8 at 2, and licensing that use anyway would "have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995) (quotation omitted). Defendants' fallback—that the Album is "in-context publicity and promotion," Dkt. 30 at 22—ignores that the grant, "[n]otwithstanding anything to the contrary," forbids endorsement and merchandising uses. Dkt. 1-8 at 2. Whether the Album promotes the Docuseries or is a distinct commercial product is pleaded and accepted, Compl. ¶¶ 186–93, as are damages, *id.* ¶ 240.

**E. Banks Plausibly Alleges a Lanham Act Claim**

This Court is likely aware that artists have put their faces on album covers throughout the history of modern music so consumers know who is offering it. Here, Banks pleads just that: her image "occupies the dominant visual position conventionally occupied … by the featured artist," while the composers do not appear. Compl. ¶¶ 189(e), 190, 261–62. And Paragraph 268 offers the Agreement's restrictions as evidence of what sophisticated parties understood the use to signal.

Those allegations place Banks' claims outside *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), which does not apply "when an alleged infringer uses a trademark in the way the Lanham Act most cares about: as a designation of source for the infringer's own goods," even if the use of the trademark has other expressive

content or conveys a message on top of source. *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 153, 157 (2023); *Hara v. Netflix, Inc.,* 146 F.4th 872, 879 (9th Cir. 2025).

*Hara*, a case in which the court found use of the offending likeness to be "incidental" and "fleeting," offers Defendants no assistance since there was "no indication that [plaintiff] originated the show," 146 F.4th at 879–80, 884. Dominant use on an album cover is fundamentally different, and which cover element governs consumer perception, Dkt. 30 at 23, is a "predominantly factual" question, *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001) (citation omitted), not proper for resolution on the pleadings.

This Court's decision in *Haas Automation, Inc. v. Steiner*, 750 F. Supp. 3d 1107 (C.D. Cal. 2024), is not contrary. There, the offending use of a sponsor's marks "merely [told] the consumer what the Book is about and who the author worked for," and the sponsor endorsed it. *Id*. at 1118, 1119 n.5. By contrast, here the Album is not about Banks, and she has not endorsed it. Indeed, the relationship between Banks and the Docuseries tells the consumer nothing about the twenty-six instrumental tracks by three composers offered on the Album.

*Twentieth Century Fox Television v. Empire Distribution, Inc.,* 875 F.3d 1192, 1196–97 (9th Cir. 2017), is also inapplicable. It held only that a protected work "may be advertised and marketed by name"—there Fox's own title on its own soundtrack—not that a third party's face may identify a separate product.

And there are no viable nominative fair use claims here, as no Defendant is using Banks' image "'to describe the plaintiff's product, rather than its own.'" *Downing*, 265 F.3d at 1009 (*quoting New Kids on the Block v. News Am. Publ'g, Inc*., 971 F.2d 302, 308 (9th Cir. 1992)). Rather, Netflix Music sold its own product which, unlike in *Cairns v. Franklin Mint Co*., did not reasonably need to use Banks' face to describe the composition of that product. 292 F.3d 1139, 1153 (9th Cir. 2002) (use of Diana's name to describe memorabilia with her likeness); *see also*

*New Kids*, 971 F.2d at 308. The placement—portrait dominant, authors in subordinate text—itself suggests endorsement "in conjunction with the mark." *Id.* *Downing* found "a genuine issue of material fact" on that element, 265 F.3d at 1009; *Cairns* called it "a closer call" on summary judgment, 292 F.3d at 1155. Both authorities make clear it is not properly resolved on the pleadings.

### F. Leave to Amend Should Be Granted as to Any Claim Found Deficient

If any claim is found deficient, Banks requests leave to amend. Fed. R. Civ. P. 15(a)(2). The anti-SLAPP statute does not alter that rule in federal court: granting a special motion to strike "without granting the plaintiff leave to amend would directly collide with Fed. R. Civ. P. 15(a)'s policy favoring liberal amendment." *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004). Defendants identify no ground of futility.

## V. CONCLUSION

The motion should be denied. In the alternative, the Court should resolve Banks' Rule 56(d) motion before ruling, or grant leave to amend.

CLARE LOCKE LLP

Dated: September 21, 2026 By: /s/ *Mitchell Langberg*

Mitchell Langberg
Thomas A. Clare, P.C.*
Megan McGuiggan*
Carolyn Wesnousky*
* *Pro hac vice forthcoming*
*Attorneys for Plaintiff Tyra Banks*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Tyra Banks, certifies that this brief contains approximately 6, 909 words, which complies with the word limit set forth in L.R. 11-6.1, as required by Central District of California Local Rule 11-6.2 and is approximately 21 pages, which complies with the page limit set forth by the Court's Standing Order (Dkt. 18).

Dated: September 21, 2026 By: /s/ *Mitchell Langberg*

Mitchell Langberg
CLARE LOCKE LLP

*Attorney for Plaintiff Tyra Banks*